IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH T. HAYES       :    CIVIL ACTION
                             :
       v.                    :
                             :
AMERICAN INTERNATIONAL    :
GROUP, et al.               :    NO. 09-2874

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                   July 29, 2014

I.      FACTUAL BACKGROUND . . . . . . . . . 3

II.     PROCEDURAL HISTORY . . . . . . . . . 18

III.    SUMMARY JUDGMENT STANDARD . . . . . . 19

IV.    DEFENDANT U.S. LIFE'S MOTION FOR SUMMARY JUDGMENT . 19

     A. Choice of Law . . . . . . . . . 20

     B. Collateral Estoppel . . . . . . . . 21

     C. Plaintiff's Claims Against Defendant U.S. Life . . . . 26

         1. The Terms of the Policy . . . . . . 26

         2. Plaintiff's Claim for Breach of Contract . . . . 37

         3. Plaintiff's Claim for Violation of 42 Pa.C.S.A. §8371
            (Bad Faith) . . . . . . . . 41

         4. Plaintiff's Claim for Breach of Fiduciary Duty . . . 42

     D. Defendant U.S. Life's Claims Against Plaintiff . . . . 47

         1. Counterclaim for Breach of Contract . . . . . 47

1

2.  Counterclaim for Breach of Good Faith and Fair Dealing   .      .   50

3.  Counterclaim for Conversion   .      .      .      .      .      .   52

4.  Counterclaim for Unjust Enrichment   .      .      .      .      .   53

5.  Counterclaim for Fraud .      .      .      .      .      .      .   53

6.  Counterclaim Pursuant to New Jersey Fraud Prevention Act      .   54

V.   DEFENDANT AIG'S MOTION FOR SUMMARY JUDGMENT   .      .   55

VI.   DEFENDANT U.S. LIFE'S MOTION TO PRECLUDE EXPERT   .      .   59

A. Legal Standard   .      .      .      .      .      .      .      .      .   60

B.  Discussion      .      .      .      .      .      .      .      .      .   62

1.  Whether Mr. Howarth is Qualified as an Expert      .      .   62

2.  Whether Mr. Howarth's Report is Reliable   .      .      .   63

VII.   U.S. LIFE'S MOTION TO STRIKE PLAINTIFF'S DECLARATION      .   66

VIII.   CONCLUSION      .      .      .      .      .      .      .      .   74

In this action, Plaintiff seeks long term disability benefits under the terms of a disability policy issued by The United States Life Insurance Company ("U.S. Life"), a wholly-owned subsidiary of American International Group ("AIG"), and U.S. Life has asserted various counterclaims.  Presently before the Court are four motions and associated briefing: (1) U.S. Life's motion for summary judgment on Plaintiff's claims and on its counterclaims (Docs. 299, 303 & 307);[1] (2) AIG's motion for summary judgment (Docs. 296, 303 & 306); (3) U.S. Life's motion to preclude the testimony of Plaintiff's expert witness (Docs. 301, 304 & 308); and (4) U.S. Life's motion to strike Plaintiff's Declaration (Docs. 313, 318 & 320).  I heard oral argument on U.S. Life's summary judgment motion on March 28, 2014[2] and gave the parties additional time to supplement their briefs, which both parties did.  See Docs. 315, 316 & 319.  For the reasons that follow, I recommend that U.S. Life's motion for summary judgment be granted as to Plaintiff's claims and denied as to U.S. Life's counterclaims; that AIG's motion for summary judgment be granted; that U.S. Life's motion to preclude expert testimony be granted; and that U.S. Life's motion to strike Plaintiff's Declaration be granted in part and denied in part.

I.    **FACTUAL BACKGROUND**

This litigation stems from the termination of benefits under a disability income insurance policy for which Plaintiff received approximately $200,000 in Total Disability

---

[1]  Defendant AIG has joined U.S. Life's motion for summary judgment and reply in support thereof.  See Docs. 300 & 309.

[2]  The parties were informed at oral argument that the remaining motions would be decided on the briefs.  See Transcript of Oral Argument 03/28/14 ("Tr.") at 4.

benefits paid between 2002 and 2006.  The case has a lengthy factual background, and the following facts are not disputed for purposes of summary judgment except as noted.

On December 20, 1994, Plaintiff, who is a physician, completed an Application for Disability Income Insurance under a plan sponsored by the American Medical Association ("AMA").  See USLIFE 00003-04.[3]  U.S. Life issued Certificate of Coverage Number 0060134630 under Group Policy No. G189553 to Plaintiff with an initial effective date of March 6, 1995 (the "Policy").  See USLIFE 00005-18.[4]  Among other things, the Policy provides for payment of a monthly income replacement benefit of $4,000 for approved disability claims.  See USLIFE 00005.  Disability Reinsurance Management Services, Inc. ("DRMS") was the claims administrator for the Policy.  See USLIFE 00071, 00825 ¶ 1.[5]

On February 6, 2002, Plaintiff submitted an "Insured's Statement" seeking Total Disability income benefits.  See USLIFE 00835E.  In the Statement, Plaintiff identified his occupation as "Physician" and his specialty as "Occupation Med[icine]," and stated that he was employed by Montgomery Hospital Medical Center.  Plaintiff stated that his

---

[3] Relevant documents are attached numerous times to various briefs.  For ease of reference, where possible record citations will be to the exhibits attached to U.S. Life's summary judgment motion (Doc. 299).  Documents stamped USLIFE 00001 through USLIFE 01311(not inclusive) are located at Exhibit A to that motion (Docs. 299-2 & 299-3) and will be referenced using their Bates-stamped numbers.

[4] The cited Policy shows an effective date of September 1, 1997.  See USLIFE 00005.  There is no dispute that the cited Policy was in place at the relevant time or to the terms that it contained.

[5] DRMS was named as a defendant in Plaintiff's complaint, but was dismissed on April 29, 2013, by stipulation.  See Doc. 270.

accident or sickness began on November 6, 2001, and that he last worked on November 20, 2001.  He described his sickness or injury as "severe low back & neck pain numbness" caused when "a[n]other employee forcefully pushed an exit door into my head on 11/6/2001 at Montgomery Hospital. . . ."  (The alleged November 6, 2001 incident will be referred to as the "Work Accident").  Where the Statement asked about his anticipated return to work on either a full- or part-time basis, Plaintiff indicated "n/a."  In support of his claim for disability under the Policy, Plaintiff submitted an Attending Physician Statement ("APS") dated February 12, 2002, and completed by Steven Valentino, D.O., in which the doctor opined that Plaintiff's physical impairment was "Class 5 – Severe limitation of functional capacity; incapable of minimal (sedentary) activity (75-100%)."  See USLIFE 00835F.  Dr. Valentino further opined that Plaintiff was totally disabled and anticipated that he would be able to perform his work duties in three to six months.  Id. ¶¶ 9(a), (d).  DRMS acknowledged receipt of Plaintiff's claim by letter dated February 21, 2002.  See USLIFE 00825.

On February 26, 2002, Plaintiff submitted a Physician Questionnaire in connection with his claim.  See USLIFE 00718-19, Doc. 303-2 Exh. C.  He stated that prior to his disability he was practicing full time in his medical specialty of occupational medicine, and listed both Montgomery Hospital and his private practice in occupational medicine as his sources of earned income prior to disability.  Id. at 00718.  He also stated that, as of the date of the form, he worked part time performing acupuncture one day per week for five hours.  Id. at 00719.

5

By letter dated March 14, 2002, DRMS approved Plaintiff's claim for Total Disability benefits with a disability date of November 21, 2001.  See USLIFE 00680. The letter also advised that based on a 90-day elimination period that must be satisfied before benefits are payable, the initial benefit check for $4,000 would cover the period from February 19 to March 19, 2002.  At the same time, DRMS advised Plaintiff that he would need to periodically update his status in order to continue receiving Total Disability benefits, and that he could be eligible for Residual Disability benefits "[w]hen you are medically able to return to work in your current occupation, but due to your medical condition are unable to sustain full-time occupational duties."  Plaintiff thereafter received and deposited 50 monthly checks for $4,000 each through April 2006.  See USLIFE 00229-78; Hayes Dep. 4/19/13, Doc. 299-4 Exh. B at 934-42 ("Hayes Dep.").

Plaintiff updated his status by submitting "Supplemental Proof of Loss Long Term Disability – Claimant Statement" forms dated May 13, 2002, June 14, 2003, November 29, 2004 and October 30, 2005.  See USLIFE 00659-60, 00583, 00514, 00479.  In each, Plaintiff represented that he continued to be "totally disabled and unable to perform all the duties of [his] regular occupation," and that he expected to return to his regular occupation in roughly four to six months.  Id. ¶ 6(a).  In response to the question "Are you now gainfully employed in other than your regular occupation?" Plaintiff gave no response on the first form dated May 13, 2002, and responded "No" on the later three forms.  Id. ¶ 6(d).  He was also asked to describe his present daily activities, and his response indicated sedentary type activities.  Id. ¶ 5(b).  For example, in his 2003 Statement, Plaintiff stated that he performs personal hygiene, feels depressed, does light

chores, visits his parents and son, and has someone in to clean the house.  See USLIFE 00586 ¶ 5(b).  He also stated that he planned to start performing medical file review as part of part-time work from home.  Id.  In his 2005 Statement, Plaintiff described his daily activities as "sedentary, self care, personal hygiene, driving [with] difficulty due to meds, shopping, household chores, making calls from home & developing status to perform work from home.  So far not too successful."  See USLIFE 00479 ¶ 5(b).

Dr. Valentino also submitted APS's dated May 22, 2002, June 17, 2003, October 13, 2004, and November 11, 2005.  See USLIFE 00656-57, 00590-91, 00932-33, 00482-83.  In each APS, Dr. Valentino opined that Plaintiff continued to have a "Class 5"-level impairment, meaning severely limited and "incapable of minimal (sedentary) activity (75-100%)."  See id. ¶ 7.  In the APS dated November 11, 2005, Dr. Valentino further opined that Plaintiff should not engage in "prolonged sitting, standing, walking, prolonged cervical flexion & extension [or] lifting [more than] 10 lbs," and that he was not expected to improve in the future and would not be able to perform his own job or any other job, in either a full-time or part-time capacity.  See USLIFE 0482 ¶ 5, 04843 ¶¶ 9-10.

Meanwhile, shortly after his alleged injury on November 6, 2011, Plaintiff sought Workers' Compensation benefits and was deposed on July 2, 2002, in connection with that claim.  See Hayes Dep. 07/02/02, Doc. 299-11 Exh I.[6]  Plaintiff testified that, as of the date of his injury, he had a part-time job at Montgomery Hospital as the Medical

---

[6] Plaintiff does not dispute that his prior testimony in other matters can be considered in this case.  Tr. at 52.

Director of Employee Health Services.  Id. at 47, 53.  In addition, Plaintiff testified that from that time through the date of his deposition he worked in his own practice at two offices in Pennsylvania where he performed treatment described generally as "pain management and acupuncture," and more specifically as "pain medicine for pain management of musculoskeletal disorders, occasionally trigger point injections."  Id. at 50, 52-53.  Workers' Compensation Judge Joseph McManus held a two-day hearing on September 24, 2002, and January 29, 2003, during which both Plaintiff and Montgomery Hospital presented testimony related to the alleged Work Accident.  See Doc. 299-7 Exh. E at P23.  By decision dated August 27, 2003, Judge McManus credited the testimony of hospital witnesses that the alleged injury did not occur and held that Plaintiff "has not met his burden of proof that on November 6, 2001, he suffered an injury while in the course and scope of his employment."  Id. at P30.  Plaintiff appealed to the Workers' Compensation Appeal Board, which unanimously affirmed Judge McManus's ruling, deferring to his assessment of the credibility of the witnesses.  Id. at P3-P12.

On November 21, 2002 – between the first and second days of his Workers' Compensation hearing – Plaintiff was involved in a motor vehicle accident.  Plaintiff and his wife thereafter became plaintiffs in a lawsuit captioned Hayes v. Petrick in the Court of Common Pleas of Montgomery County, Pennsylvania, at Civil Action No. 04-30376 ("MVA Lawsuit").  Plaintiff's testimony in this lawsuit will be reviewed in time sequence below.

DRMS records[7] reveal that on January 16, 2006, Plaintiff called DRMS to inquire about the status of his January 2006 disability benefit check.  See USLIFE 00471-71A. When DRMS Senior Managed Disability Analyst Sally Huber returned Plaintiff's call later that day, Plaintiff's wife informed her that he was at work and suggested that Ms. Huber try Plaintiff's cell phone.  See id. at 00471A.  When Ms. Huber called Plaintiff's cell phone, a woman answered with the greeting "Dr. Hayes' Office" and advised that Plaintiff was seeing patients.  See id.[8]  DRMS records further reveal that Plaintiff returned Ms. Huber's call and explained that his phone was answered in that manner because he was embarrassed to be on disability and that he had not returned to work but was trying to find a job doing medical reviews for disability claims.  See  USLIFE 00470. According to DRMS records, two days later Plaintiff told Ms. Huber that his license status was "inactive" and that he "has not gone back to work and is not earning money." See USLIFE 00465-66.

In light of Plaintiff's representations concerning his work status, DRMS hired an agency to investigate Plaintiff.  See USLIFE 00429-32, 00398-404.[9]  A background check determined that Plaintiff's Pennsylvania medical and acupuncture licenses were

---

[7] DRMS records and letters are reviewed for purposes of showing the history of the claim.  To the extent they contain DRMS's factual assertions as to Plaintiff's statements or conduct, I do not rely on the truth of those assertions to decide the pending motions.

[8] According to Plaintiff, the person who answered the phone was his wife.  See USLIFE 00326 (Hayes Letter 06/06/06) ¶ 3.

[9] As with the DRMS records, I do not rely on the truth of the investigator's reports in deciding the pending motions, but include them to review the history of the claim.

active and in good standing, both having been renewed in October 2004.  See id. at

00429-30.  On February 14, 2006, an investigator observed Plaintiff leave his residence

in Brick, New Jersey, and drive one hour and 44 minutes to the Village Shires Center

Chiropractic Community Health Center in Northampton, Pennsylvania, where he

unloaded large and small items from his car before entering the office wearing an ID

badge.  See id. at 00398-99.  The following two days, the investigator observed Plaintiff

drive almost two hours from his residence to the Montgomery Hospital Medical Center in

Norristown, Pennsylvania, where he used an access card to enter the parking garage and

was seen wearing hospital scrubs.  See id. at 00399-400.

    DRMS wrote to Plaintiff on February 16, 2006, to follow up "regarding our recent

telephone conversations."  See USLIFE 00426.  The letter advised that the Policy

"provides residual disability benefits in the event that you are able to return to work in

your own occupation or any other occupation and in any capacity," and then quoted the

relevant Policy language.  See id.  The letter asked Plaintiff to "verify any earnings that

you may have received while collecting Total Disability benefits" and to provide copies

of his corporate and personal tax returns for years 2002-2005.  See id. at 00427.

    By letter to DRMS dated February 25, 2006, Plaintiff acknowledged receiving the

letter explaining Residual Disability benefits under the Policy, stated that the issue of

"'computing the monthly benefit for residual disability' is not applicable, since there is

no revenue being produced," and explained that he was looking into "alternative careers" such as "a possibility of a career in acupuncture." See USLIFE 00396-97.[10]

DRMS referred Plaintiff's case to Alan Neuren, M.D., a board-certified physician in Neurology and Psychiatry, who produced an Independent Medical Review dated March 10, 2006. See USLIFE 00390-92. Dr. Neuren reviewed the available evidence, including Plaintiff's records from Dr. Valentino and the DRMS investigation material. Dr. Neuren opined that Plaintiff's activities were inconsistent with the severe limitations set forth by Dr. Valentino, and that Plaintiff's imaging studies showed "degenerative changes commonly seen in asymptomatic individuals in this age group with no evidence of neural compromise." See id. at 00392.

DRMS records evidence a March 15, 2006 telephone conversation between Plaintiff and Ms. Huber from DRMS in which Plaintiff asked about not receiving his check yet, and explained that he was working on opening an acupuncture practice. See USLIFE 00387. Ms. Huber asked for Plaintiff's tax records, and Plaintiff stated that he had not filed returns in 2003 or 2004 because he had no income, but would be filing for 2005 as he had a better year in the stock market and interest income to report. See id. at 00076, 00387.

In May 2006, at the request of DRMS, a financial analysis was conducted to assess and compare Plaintiff's pre- and post-disability earnings. See USLIFE 00346-49.[11]  The

---

[10] Plaintiff has not disputed his authorship of the letters in his claim file.

[11] As will be discussed, one of the Policy's eligibility requirements for Residual Disability is "a loss of Monthly Income of at least 20%." See USLIFE 00010.

analysis showed that Plaintiff earned income in each year from 2002 onward, and the report concluded that Plaintiff's post-disability income was higher than his pre-disability income.  See id. at 00346-47.

By letter dated May 18, 2006, DRMS advised Plaintiff that he would no longer receive disability benefits under the Policy because his alleged limitations were inconsistent with his actual activities and the severity of his functional impairment did not meet the definition of Total Disability under the Policy.  See USLIFE 00332-35.  The letter detailed DRMS's communications with Plaintiff, the investigation report, and Dr. Neuren's findings.  DRMS further advised Plaintiff that he had not furnished tax information from the years 2002-2005 as requested three months earlier, and that a check with the Social Security Administration of his FICA and Medicare wages showed earnings in 2002 ($51,680), 2003 ($86,172) and 2004 ($95,500).  See id. at 00334. DRMS also reserved the right to request repayment of part of his Total Disability benefits (totaling $183,800).  See id. at 00335.

Plaintiff responded to DRMS by letter dated June 6, 2006.  See USLIFE 00326-29. Among other things, Plaintiff stated that he had no office in the Montgomery Hospital Medical Center but was in negotiations to rent a small office, and that the DRMS investigator had observed him at the office where he intended to initiate a "part-time acupuncture practice."   See id. at 00328.  Plaintiff further stated that he had returned to work for one day per week as of June 1, 2006, and that his Total Disability payments should be converted into Residual Disability.  See id. at 00329.

By letter to Plaintiff dated July 13, 2006, DRMS reiterated that Plaintiff's activities were inconsistent with Total Disability, that he failed to refute that he was making significant income rendering him ineligible for Residual Disability, and requesting that he sign an IRS form allowing DRMS to obtain his tax records.  See USLIFE 00075-78.  DRMS reaffirmed the termination of Plaintiff's disability benefits.

A series of additional letters followed.  On July 22, 2006, Plaintiff stated the "numbers that you have derived" from Social Security "do not coordinate with my official file at the SSA," and refuted aspects of the investigation into his activities.  See USLIFE 00092-96.  On August 8, 2006, Plaintiff stated that he had returned to work on a part-time basis in February 2006 – four months earlier than when he stated in his June 6, 2006 letter – and that he wanted to "formalize my request in writing to rescind the termination of [my] claim and to restore it to residual disability."  See id. at 00090-91. On August 28, 2006, DRMS responded by identifying numerous inconsistent representations made by Plaintiff concerning his activities and restrictions.  See id. at 00079-81.  On September 15, 2006, Plaintiff stated that his income as listed by DRMS was incorrect and that his tax returns for 2001-2004 were not relevant to his eligibility for Residual Disability.  See id. at 00301.  On September 27, 2006, DRMS advised Plaintiff that it was upholding its May 18, 2006 determination denying his claim for benefits.  See id. at 00082.

On November 9, 2006, a letter on AIG letterhead informed Plaintiff that a review of his claim file had been completed and that the decision to terminate benefits would stand.  See USLIFE 00291, Doc. 303-2 Exh. B.  The letter also informed Plaintiff that the

matter had been referred to the New Jersey Department of Insurance, Office of the Insurance Fraud Prosecutor, who eventually indicted Plaintiff for insurance fraud.[12]  By letter dated December 14, 2006, DRMS again reiterated that it was not considering his claim further.  See USLIFE 01302.

On December 18, 2006, Plaintiff was deposed for purposes of his MVA Lawsuit. See Hayes Dep. 12/18/06, Doc. 299-2 Exh. G.  Plaintiff testified that at the time of the motor vehicle accident on November 21, 2002 – that is, approximately nine months after he started receiving Total Disability benefits under the Policy – he was working as a sole practitioner as a "pain management specialist, acupuncturist." Id. at 12-13.  He had two offices in Pennsylvania where he continued to work in this capacity after being laid off from a third place of employment at Montgomery Hospital in November 2001.  Id. at 16-19.  Plaintiff explained that, prior to being laid off, he worked about sixteen hours per week at his own offices, and that after being laid off, he worked at his offices for "[a]pproximately 34 to 36 hours, [patient] contact hours, per week."  Id. at 19.  He further explained that "for every patient contact hour [there] is about a half hour to hour of everything else you have to do with a patient," such as paperwork.  Id. at 33-35.  Plaintiff also testified that during "the last two years I have been trying to make an attempt to increase my hours and actually hired a number of people to help me with that," but that he "just couldn't keep up with the demands."  Id. at 35-36.

---

[12] Plaintiff generally denies that he knowingly hid materials or information from Defendants, and Plaintiff's counsel advised at the oral argument that the New Jersey action has ended without an admission of guilt or a conviction.  Tr. at 143.

In a January 25, 2007 letter to the AMA insurance agency regarding his claim, Plaintiff stated that the years 2002 through 2005 were difficult, but that "in the year 2006, I did return to work on a part-time basis in a field of healthcare that is somewhat different than my training and primary board certification."  See USLIFE 00223, Doc. 316-2 Exh. W.  Plaintiff further stated that "at this juncture, to debate residual disability is moot since my earned net income exceeds the minimum income for residual disability. Therefore, I would not be eligible for residual disability based on the terms of the policy."  Id.[13]

The foregoing file review reveals an unsettled record as to the exact nature of Plaintiff's work prior to and after his alleged disability.  As noted, in his Physician Questionnaire, Plaintiff stated that prior to becoming disabled he practiced occupational medicine at Montgomery Hospital and in his private practice. See USLIFE 00718-19, Doc. 303-2 Exh. C.  Plaintiff testified in connection with this case that at the time of his Work Accident, he specialized in occupational medicine at the hospital and worked part time in his own private practice where he performed pain management and acupuncture.

---

[13] The record contains one additional transcript of Plaintiff's testimony, although it concerned a time period after benefits ended.  On March 29, 2007, Plaintiff testified as a medical expert for a plaintiff in a Workers' Compensation case.  See Hayes Dep. 03/29/07, Doc. 299-10 Exh. H.  In reviewing his qualifications, Plaintiff testified that he had a two-part practice involving the evaluation and treatment of diseases and injuries of the work place, as well as the treatment of acute and chronic pain, and that he was board-certified in preventative medicine and occupational medicine.  Id. at 6-7.  Plaintiff stated that he was engaged in the full-time practice of medicine, that he treated his patients in "essentially three areas, physical medicine, medications and acupuncture [for] which I am licensed by the state," and that he also provided about six or seven depositions a year with respect to his own patients as well as IME's or review of records for insurance companies.  Id. at 7-8.

Hayes Dep. 07/02/02 at 50; 12/18/06 at 12, 15-18.  He testified at his Workers'

Compensation hearing that, after his injury, he continued working in his own practice

performing "pain medicine for pain management" including acupuncture and occasional

trigger point injections.  Hayes Dep. 07/02/02 at 52-53.  He testified at his motor vehicle

accident lawsuit that after being laid off from Montgomery Hospital in November 2001

he increased his sole practitioner work as a pain management specialist and acupuncturist

from sixteen hours a week to 34 to 36 patient contact hours a week plus one-half to one

hour per patient for paperwork.  Hayes Dep. 12/18/06 at 18-20, 33-36.  Plaintiff states in

his Declaration that, prior to his disability, he was engaged in the full-time practice of

occupational medicine, and that his acupuncture work took up little of his time and did

not generate realized income.  See Doc. 303-1 ¶ 4.

Billing records from Plaintiff's private practice indicate that he billed for

considerable work during the period of time when he received Total Disability benefits.

For example, Plaintiff billed Blue Cross and Blue Shield for 4,092 procedures between

2003 and 2006 (625 in 2003, 1,064 in 2004, 1,229 in 2005, and 1,174 in 2006).  See Doc.

299-12 Exh. J.  Plaintiff billed Highmark Medical Services for 3,918 procedures between

2002 and 2006 (628 in 2002, 1,349 in 2003, 987 in 2004, 774 in 2005 and 180 in 2006).

See Doc. 299-13 Exh. K.[14]  Plaintiff also billed Highmark Blue Shield for 1,410

procedures between 2002 and 2006 (44 in 2002, 393 in 2003, 315 in 2004, 336 in 2005,

---

[14] According to U.S. Life, Highmark Medical Services processes claims under
Medicare Part B, which does not cover acupuncture.  See 299-23 Exh. U at 4.  However,
the nature of the services is not for resolution at this stage.

and 322 in 2006). <u>See</u> Doc. 299-14 Exh. L.  In addition, Plaintiff billed Arrowpoint

Capital for 313 procedures in 2005 and 2006, Inservco Insurance Services, Inc., for 317

procedures between 2002 and 2006, Utica Insurance for 525 procedures in 2001 and

2002, and Erie Insurance for 174 services in 2004 and 2005.  <u>See</u> Doc. 299-15-18 Exhs.

M-P.

Plaintiff's business tax records have been produced and reveal that he was paid

compensation by his professional corporation of $37,600 in 2002, $81,200 in 2003,

$95,500 in 2004, $86,000 in 2005, and $72,750 in 2006.  <u>See</u> Doc. 316-9 Exh. CC.[15]

Plaintiff testified that this income was from his private practice.  Hayes Dep. 04/19/13,

Doc. 299-4 Exh. B at 942-53.   Plaintiff's counsel confirmed at oral argument that income

listed on Plaintiff's tax returns reflected "earned income from providing care to patients."

<u>Tr.</u> at 131.

The nature of the services Plaintiff was providing in his private practice is in

dispute, specifically whether any were occupational medicine services.  On February 6,

2012, Jim Howarth, president of Plaintiff's former billing service Global Medical Billing,

LLC ("GMB)," issued an expert report on behalf of Plaintiff.  <u>See</u> Doc. 301-2 ("Howarth

Report").  In his report, Mr. Howarth opined that after November 21, 2001, Plaintiff did

not submit medical billing related to occupational medicine, but rather exclusively for

acupuncture.  <u>See</u> <u>id.</u> ¶ 6. Mr. Howarth rendered his opinion "to a reasonable degree of

medical certainty," based on his review of thousands of CPT codes Plaintiff submitted to

---

[15] Plaintiff's business tax return shows that zero was paid in compensation in 2001.
<u>See</u> Doc. 316-8 Exh. C at 22.

insurers for his services.  Id.  U.S. Life disputes the admissibility of Mr. Howarth's report.

## II.   **PROCEDURAL HISTORY**

On June 26, 2009, Plaintiff filed his complaint based in diversity of citizenship and alleging four counts:  I – Breach of Contract; II – Unfair Trade Practices and Consumer Protection Law and Bad Faith; III – Intentional Misrepresentation; and IV – Breach of Fiduciary Duty.  See Doc. 1.  On December 1, 2009, Judge McLaughlin granted U.S. Life's motion to dismiss Plaintiff's claims for fraudulent misrepresentation and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Act, and denied the motion to dismiss Plaintiff's claim for breach of fiduciary duty and statutory bad faith.  See Docs. 25-26.  On December 31, 2009, U.S. Life filed its answer and asserted counts in counterclaim: I – Fraud; II – New Jersey Insurance Fraud Prevention Act; III – Breach of Contract; IV – Duties of Good Faith and Fair Dealing; V – Conversion by False Pretenses; VI – Unjust Enrichment; and VII – Declaratory Relief.  See Doc. 32.  AIG answered jointly with U.S. Life.  See id.

In the years since the complaint was filed, the parties engaged in a protracted and at times difficult course of discovery complicated by the fact that Plaintiff changed counsel and was pro se for a considerable period of time.  Judge McLaughlin has referred the pending motions to the undersigned for a Report and Recommendation.  See Docs. 305 & 314.

18

### III.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute. . . ." Fed. R. Civ. P. 56(c)(1)(A), (B).  "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Techs., Inc., 78 F.Supp.2d 402, 408 (E.D. Pa. 2000).  The evidence presented must be viewed in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255; Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).

### IV.    DEFENDANT U.S. LIFE'S MOTION FOR SUMMARY JUDGMENT

Defendant U.S. Life seeks summary judgment on the ground that Plaintiff's claims are barred by operation of collateral estoppel, and in the alternative that it is entitled to judgment as a matter of law on each of Plaintiff's claims.  See Doc. 299-1 at 41-65; Doc. 307 at 1-12; Docs. 316 & 319.[16]  U.S. Life also argues that it is entitled to judgment as a

---

[16] Page numbers for the parties' briefs will refer to the ECF pagination.

matter of law on each of its counterclaims against Plaintiff.  See Doc. 299-1 at 65-76;

Doc. 307 at 13-15.  Plaintiff counters that U.S. Life is not entitled to summary judgment

as to Plaintiff's claims or U.S. Life's counterclaims.  See Doc. 303; Doc. 315.

Before turning to the claims at issue, I will review applicable choice of law

principles and address U.S. Life's argument that all of Plaintiff's claims are barred by

collateral estoppel.[17]

## A.    Choice of Law[18]

In cases such as this one where the federal court's jurisdiction lies in diversity, the

federal court will procedurally apply the choice of law principles of the forum state.

Huber v. Taylor, 469 F.3d 67, 73 (3d Cir. 2006) (citing Klaxon Co. v. Stentor Elec. Mfg.

Co., 313 U.S. 487, 496 (1941)).  Therefore, Pennsylvania's choice of law standards

apply.

The choice of law analysis employed in Pennsylvania is flexible insofar as it

"permits analysis of the policies and interests underlying the particular issues before the

court."  Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964).  If the laws of

---

[17] U.S. Life has filed a motion to strike Plaintiff's Declaration, arguing that the averments made by Plaintiff are improper on various grounds and that it should not be considered in the context of the summary judgment motion.  (Plaintiff's sworn Declaration was docketed as Doc. 303-1 and U.S. Life's motion to strike as Doc. 313).  U.S. Life's motion to strike will be considered in Part VII, infra.  Generally, to the extent the Declaration contains averments of fact as to Plaintiff's understanding or knowledge and to the extent it refers to documents that are in the discovery record, those averments and documents are proper and will be considered.  To the extent it contains opinion or argument, it will not be considered.

[18] There is no dispute regarding the applicable choice of law analysis.  See Doc. 299-1 at 38-40; Doc. 303 at 8 n.1.

two jurisdictions are the same, then there is no conflict and a choice of law analysis is unnecessary.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007); Huber, 469 F.3d at 74.  If there is a conflict between the laws of two states regarding a particular issue and the states would treat the issue differently, a court should examine the governmental policies underlying each law, and classify the conflict as "true," "false," or "unprovided-for."  Hammersmith, 480 F.3d at 230.  A deeper choice of law analysis is necessary only when a true conflict exists, meaning when "both jurisdictions' interests would be impaired by the application of the other's laws."  Id.[19]  Choice of law will be discussed more specifically in the context of each of the substantive claims addressed below.

**B.** **Collateral Estoppel**

As previously explained, Workers' Compensation Judge McManus credited hospital employees over Plaintiff in concluding that Plaintiff failed to meet his burden of proving that he suffered a work-related injury on November 6, 2001, a determination that was unanimously affirmed by the Workers' Compensation Appeal Board.  See Doc. 299, Exh. E at P4, P12.  Because Plaintiff's disability claim was based on that same alleged work injury, U.S. Life argues that Plaintiff's claims are barred in their entirety by the doctrine of collateral estoppel.

---

[19] The Pennsylvania Supreme Court has not specifically addressed whether the Griffith test applies to breach of contract claims, but other Pennsylvania courts have routinely extended Griffith to contract actions.  See Hammersmith, 480 F.3d at 228 (reaffirming earlier prediction that Pennsylvania Supreme Court will apply Griffith test to contract actions); Budtel Assocs., L.P. v. Cont'l Cas. Co., 915 A.2d 640, 644 (Pa. Super. 2006) ("[T]he spirit and weight of this Commonwealth's precedents mandate we follow the Griffith rule in the contract law context.").

Under Pennsylvania law, collateral estoppel bars a party from litigating an issue if the following four elements are satisfied: (1) the issue decided in a prior action is identical to the one presented in the later action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to the prior action or was in privity to the prior action, and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. Rue v. K-Mart Corp., 713 A.2d 82, 84 (Pa. 1998).[20] U.S. Life argues that all four elements are met, and that it is therefore entitled to summary judgment as to Plaintiff's affirmative claims.

It is not disputed that collateral estoppel elements two, three and four are satisfied here. The Workers' Compensation matter resulted in a final judgment on the merits, Plaintiff was a party in the Workers' Compensation action, and the Workers' Compensation proceedings gave Plaintiff a full and fair opportunity to litigate the issue. That leaves only the first element, namely whether the issue decided in the prior Workers' Compensation matter is identical to the one presented here. At one level, the answer to that question is "no"; the Workers' Compensation court was concerned with

---

[20] This test is almost identical to the five-part test set forth in New Jersey: (1) the issue to be precluded is identical to the issue decided in the prior action, (2) there was a full and fair opportunity to litigate the issue in the prior action, (3) a final judgment on the merits issued in the prior action, (4) the determination of the issue was essential to the prior judgment, and (5) the party against whom collateral estoppel is asserted was a party to the prior action or was in privity to the prior action. Pivnick v. Beck, 741 A.2d 655, 661 (N.J. Super. 1999). Although New Jersey includes the additional requirement that the determination of the issue was essential to the prior judgment, this does not create a conflict because the alleged Work Accident was the essential issue of the Workers' Compensation proceeding.

whether the Work Accident occurred, whereas Plaintiff commenced this lawsuit for damages as a result of the termination of his disability benefits under the Policy. However, to meet the definition of Total Disability under the Policy, Plaintiff's disability "must be the result of an injury or sickness."  See USLIFE 00010.  In his Insured's Statement applying for benefits under the Policy, Plaintiff identified his "injury or sickness" as "severe low back and neck pain numbness," and then responded to the question "If injured, how, when and where did accident happen?" as follows: "Another employee forcefully pushed an exit door into my head on 11/6/2001 at Montgomery Hospital."  Id. at 00835E.

U.S. Life argues that the Workers' Compensation proceeding decided this very issue against Plaintiff, denying his claim on the grounds that November 6, 2001 Work Accident simply did not happen.  U.S. Life distinguishes this particular claim from one in which, for example, someone claims disability based on a chronic or degenerative condition and does not rely on the veracity of statement attributing the disabling condition to a particular injury.  Tr. at 93-99.  Put another way, U.S. Life essentially argues that, because Plaintiff attributed his entitlement to Total Disability benefits under the Policy to the identical Work Accident underlying his claim for Workers' Compensation benefits, both cases rise or fall on whether the Work Accident occurred.

Initially, the fact that the prior proceeding concerned workers' compensation does not itself preclude application of collateral estoppel.  The key is whether the issues are the same.  Several courts have applied collateral estoppel where the issue before them was not identical to the issue before a prior workers' compensation hearing, but the facts at

23

issue were sufficiently close to justify preclusion.  See, e.g., Jones v. United Parcel Serv.,

214 F.3d 402 (3d Cir. 2000) (workers' compensation decision that plaintiff had recovered

from his work-related injury had preclusive effect in his subsequent suit claiming failure

to accommodate under Americans with Disabilities Act ("ADA")); Kohler v. McCrory

Stores, 615 A.2d 27, 32-33 (Pa. 1992) (workers' compensation decision that plaintiff's

injury was work-related estopped him from arguing in subsequent negligence action that

the injury was not work-related);  Capobianchi v. BIC Corp., 666 A.2d 344, 348-49 (Pa.

Super. 1995) (workers' compensation finding that plaintiff did not suffer a work-related

injury had preclusive effect in subsequent products liability action relying on the same

alleged injury); Grant v. GAF Corp., 608 A.2d 1047, 1054-56 (Pa. Super. 1992) (same);

Christopher v. Council of Plymouth Twp., 635 A.2d 749, 752 (Pa. Commw. 1993)

(workers' compensation finding that plaintiff did not suffer work-related injury had

preclusive effect in his subsequent action for disability benefits under collective

bargaining agreement).

　　　In Jones, the Third Circuit addressed whether the issue decided in a prior workers'

compensation proceeding (whether the plaintiff had fully recovered from his work injury,

which was answered in the affirmative) was identical to the issue presented in the

employee's subsequent civil action under the ADA.  See 214 F.3d at 406.  The Third

Circuit stated that – despite the differing issues, policy goals and definitions underlying

the ADA and the workers' compensation statute – "[a]  fact is a fact, regardless of public

policy."  Id. (quoting Rue, 713 A.2d at 85).  Therefore, the Third Circuit predicted that

the Pennsylvania Supreme Court would apply the doctrine of collateral estoppel and held

that the prior workers' compensation factual finding that the employee had fully recovered from his work injury precluded his subsequent ADA action. Id. In Jones and the other aforementioned cases, the courts compared the prior workers' compensation issue with the pending action to determine that a party's case rested on a disputed fact that was previously resolved against that party. The same is true here, and while none of the cited cases involved an action for benefits under a disability policy, I see no principled basis to distinguish them.

Plaintiff argues that the important question is not what injury or illness caused his disability, but rather whether a disability existed, regardless of the cause. See Doc. 303 at 11; Tr. at 87-92. Plaintiff essentially invites the Court to ignore the fact that he attributed his disability to the Work Accident. See Tr. at 90 ("I think you just avoid it, because you have to forget about the cause because the cause doesn't have any meaning."). Certainly, the "injury or sickness" language of the Policy presupposes that a disability could be caused by either an injury or a sickness, whether attributable to something acute and therefore easy to pinpoint, or something that develops over time and therefore more difficult to pinpoint. Plaintiff argues that whether or not the Work Accident happened, he was entitled to disability benefits due to medically substantiated neck and back pain and numbness which became disabling in late 2001 and remained so throughout the relevant period. From Plaintiff's perspective, therefore, the Work Accident is irrelevant and collateral estoppel is inapplicable.

Plaintiff's position ignores the facts and history of his claims. If he were disabled for some reason other than the Work Accident, that would be contrary to his Insured's

25

Statement seeking disability benefits under the Policy, not to mention the testimony he gave under oath in the workers' compensation hearing, and to his Complaint in this civil action.[21]  I cannot simply ignore the fact that Plaintiff seeks disability benefits in this action as a result of the Work Accident when a prior court has determined that the Work Accident never happened.  Because the Work Accident formed the basis of both his Workers' Compensation claim and his benefits under the Policy, I find that the final element of collateral estoppel is satisfied.  A finding in this case that Plaintiff qualified for disability benefits would require a finding of fact directly contrary to facts found in the prior proceeding.  Accordingly, I recommend that Plaintiff's claims be dismissed by operation of collateral estoppel.

In the event collateral estoppel is not found to be determinative, U.S. Life argues in the alternative that it is entitled to judgment as a matter of law on each of Plaintiff's claims.  See Doc. 299-1 at 49-65; Doc. 307 at 4-12; Doc. 316.  In the interest of completeness, I will proceed to discuss the Policy terms in detail and to address Plaintiff's claims on the merits.

### C.   Plaintiff's Claims Against Defendant U.S. Life

#### 1.   The Terms of the Policy

I begin analysis of the merits of the claims with an examination of the relevant policy language.  U.S. Life argues that the Policy is clear and unambiguous, that Plaintiff

---

[21] See Complaint, Doc. 1 ¶¶ 30 ("On or about November 6, 2001, Dr. Hayes was struck in the left frontal region by a door at Montgomery Hospital which caused extension and rotational injuries to his neck and low back."), 42 ("Dr. Hayes notified . . . DRMS that he was disabled under the policy due to spinal injuries sustained on November 6, 2001.").

was never entitled to Total Disability or Residual Disability benefits, that Plaintiff's disability claim and receipt of benefits was predicated and maintained by fraud, and that it is therefore entitled to judgment as a matter of law.  Plaintiff counters that the Policy language is at the very least ambiguous, and that genuine issues of material fact exist as to whether he was entitled to the Total Disability benefits he received, precluding the granting of summary judgment.

With respect to choice of law, the parties appear to agree that the Policy should be interpreted under New Jersey law.  U.S. Life states in its summary judgment motion that the Policy was made and delivered in New Jersey, and the benefits were received by Plaintiff in New Jersey, and therefore "New Jersey has the greater interest in the Policy." See Doc. 299-1 at 66.  Plaintiff agrees with U.S. Life's statement regarding which state has the greater interest, and states that "New Jersey Law should govern construction of the Policy itself."  See Doc. 303 at 8 n.1.  Moreover, under Pennsylvania choice of law rules, an insurance contract is governed by the law of the state where it was made. Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 163 (3d Cir. 2006); see also Nat. Util. Serv., Inc. v. Chesapeake Corp., 45 F. Supp.2d 438, 447 (D.N.J. 1999) ("There is a presumption that the law of the place of contracting should apply to the interpretation of the contract.").  Therefore, I will apply New Jersey law in interpreting the Policy.

Under New Jersey law, "special scrutiny" is given to insurance contracts because of the "stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies."  Webb v. AAA Mid-

27

Atlantic Ins. Group, 348 F. Supp.2d 324, 327 (D.N.J. 2004) (quoting Zacarias v. Allstate Ins. Co., 775 A.2d 1262, 1264 (N.J. 2001)).  "In the first instance, the words of an insurance policy are to be given their plain, ordinary meaning."  Zacarias, 775 A.2d at 1264.  Under the doctrine of reasonable expectations, courts should give effect to the "objectively reasonable expectations" of the insured, "even when that understanding contradicts the insured's intent."  Id. at 1264-65.  Similarly, ambiguous language in an insurance contract is to be construed in favor of coverage for the insured.  Webb, 348 F. Supp.2d at 328 (citing Doto v. Russo, 659 A.2d 1371 (N.J. 1995)).  An ambiguity exists in an insurance contract "[w]hen an insurance policy's language fairly supports two meanings, one that favors the insurer, and the other that favors the insured. . . ."  Id. (quoting President v. Roncone, 853 A.2d 247 (N.J. Super. 2004)).  However, the presumption in favor of the insured should not be employed to create an ambiguity which does not exist, as a liberal contract construction is not warranted when the policy is clear on its face.  See id. (citing Priest v. Roncone, 851 A.2d 751 (N.J. Super. 2004)).

The most relevant portions of the Policy for present purposes appear in three sections entitled "Definitions," "Monthly Benefits," and "Monthly Benefits Payable for Residual Disability."

### DEFINITIONS

TOTAL DISABILITY means your inability to perform the substantial and material duties of your current occupation beyond the end of the [90-day] Elimination Period.

The Total Disability must be a result of an injury or sickness which begins while insured under the group policy.  To be considered totally disabled, you must also be under the

28

regular care of a physician.

CURRENT OCCUPATION means the duties of the medical specialty then being practiced or of the occupation being performed immediately prior to the disability.

RESIDUAL DISABILITY means that due to injury or sickness:

    1)  You are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them, after you go back to work following a period of consecutive days of Total Disability equal to the Elimination Period;

    2)  Your inability to perform duties as in 1) above is due to the same condition that caused the Total Disability;

    3)  You have a loss of Monthly Income of at least 20%; and

    4)  You are under the regular care of a Physician. . . .

For purposes of computing the Monthly Benefit for Residual Benefit for Residual Disability: PRIOR MONTHLY INCOME means your average Monthly Income for the tax year with the highest income in the three years just prior to the start of the period of Disability for which claim is made; CURRENT MONTHLY IMCOME means your Monthly Income for each month of Residual Disability being claimed; LOSS OF MONTHLY INCOME means the difference between Prior Monthly Income and Current Monthly Income. Loss of Monthly Income must be caused by the Residual Disability for which claim is made.  The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income.

. . . .

## MONTHLY BENEFITS

The Monthly Benefit for Total Disability will begin to accrue on the day after the [90-day] Elimination Period ends.  It will be paid in the amount shown on the Schedule Page.

29

The Monthly Benefits payable for Residual Disability are described on the next page.  This Benefit will be paid according to the formula shown in the Schedule of Benefits, if applicable.

. . . .

**MONTHLY BENEFITS PAYABLE FOR RESIDUAL DISABILITY**

If you become engaged in any gainful occupation, [U.S. Life] will pay the Monthly Benefit for Residual Disability shown in the Schedule of Benefits . . .

. . . .

[U.S. Life] can require any proof which is considered necessary to determine your Current Monthly Income and Prior Monthly Income.  Also, [U.S. Life] or a representative retained by [U.S. Life] will have the right to examine your financial records, as we may reasonably require.

In the event you go back to work at any occupation other than the one in which you were considered Totally Disabled, and no Residual Disability Benefit is paid for a period of twenty-four (24) consecutive months, you will be conclusively presumed to have established a new occupation and the period of Disability will cease for the purposes of the group policy. . . .

USLIFE 00010-11.

The core dispute in this case is Plaintiff's entitlement to Total Disability benefits under the Policy, and therefore the definition of "Total Disability" is of paramount importance.  "Total Disability" is defined as "inability to perform the substantial and material duties of your current occupation," and "current occupation" is further defined as "the duties of the medical specialty then being practiced *or* of the occupation being

30

performed immediately prior to the disability." USLIFE 00010 (emphasis added). U.S. Life argues that the definition of "current occupation" unambiguously means that an insured's occupation is either the medical specialty then being practiced *or* some other occupation being performed at the same time, and that a determination of which job constituted the "current occupation" turns on which job or jobs generated the most income. Tr. at 8-11. Applied to this case, U.S. Life argues that although Plaintiff worked as an occupational medicine specialist at the hospital where the alleged Work Accident occurred, he simultaneously performed pain management and acupuncture services at two private offices – work which continued through the period he received Total Disability benefits, and from which he generated more annual income from 2003-onward than from his previous work as an occupational medicine specialist. See Doc. 299-1 at 41-44, 46; Tr. at 18-19. U.S. Life's position is not entirely clear as to whether Plaintiff's pain management and acupuncture practice was part of a "medical specialty," but it argues that under either prong of the definition Plaintiff's entire practice was part of his current occupation.

Plaintiff counters that the Policy definition of "current occupation" is ambiguous, requiring a fact-intensive investigation into an insured's income-generating activities that is not conducive to summary judgment. Tr. at 15-16. More specifically, Plaintiff argues that he understood "current occupation" to refer exclusively to occupational medicine because that was the primary medical specialty he performed at the time he became disabled, as he indicated on his Insured's Statement seeking Total Disability. See USLIFE 00835E; Tr. at 13, 16. It follows that because Plaintiff was performing a

31

medical specialty at the relevant time, he believed that any other work he performed is not relevant for purposes of "current occupation" and thus of his entitlement to Total Disability benefits under the Policy.  Neither side has been able to identify case law directly relevant to this particular insurance policy provision to support their construction.[22]

I conclude that the definition of "current occupation" is ambiguous as applied to Plaintiff, who, when the record is viewed in his favor, was working both in his primary medical specialty and another or non-medical specialty at the time of his alleged injury. The Policy was sponsored by the AMA for the purpose of providing disability insurance benefits to working physicians, and it is not unreasonable for such an insured to read this policy language as referring to his medical practice as the basis for determining his current occupation.  The problem of construction is that it is not clear whether the word "or" in the definition of "current occupation" is intended to be disjunctive or conjunctive. That is, the phrase arguably could apply to an insured's medical specialty only, alternatively to some other medical or non-medical work the insured performed

---

[22] U.S. Life relies on <u>Klay v. AXA Equitable Life Ins. Co.</u>, Civ. No. 09-0012, 2010 WL 3885117 (W.D. Pa. Sept. 28, 2010), to support its position that Plaintiff is not entitled to benefits under the Policy.  <u>See</u> Doc. 316 at 17-20.  However, the focus of <u>Klay</u> was the definition of Total Disability in reference to "the substantial and material duties" of the plaintiff's regular occupation.  The plaintiff continued to work as a vascular surgeon after falling ill but no longer performed certain surgeries, and the court concluded his ability to do some but not all of the duties warranted summary judgment in the insurer's favor on the issue of Total Disability.  2010 WL 3085117 at *12-18. However, in <u>Klay</u> there was no dispute as to the plaintiff's "regular occupation," whereas here Plaintiff's "current occupation" is disputed.  Similarly, the other cases relied upon by the parties in their supplemental briefs do not assist in resolving the question presently before the court.  <u>See</u> Doc. 315 at 8-11; Doc. 316 at 17-20.

immediately prior to his or her disability, or to a combination of these, particularly if an insured generated significant income from the non-medical specialty work. The Policy language is not clear on this point.

Even if the Policy were clearer in this regard, I note the record is unclear regarding the precise nature of the work Plaintiff performed in November 2001 when he allegedly became disabled. For example, Plaintiff worked as an occupational medicine specialist at the hospital where the alleged Work Accident happened, and he self-identified as a specialist in occupational medicine in his Insured's Statement seeking Total Disability. See USLIFE 00835E. However, he also performed at least some pain management and acupuncture work at his own private facilities. See Hayes Dep. 07/02/02 at 50, 52-53 (describing his other work as "pain management and acupuncture" and as "pain medicine for pain management of musculoskeletal disorders, occasionally trigger point injections"). It is not clear from the record how these seemingly related fields overlap, nor is it clear what income Plaintiff derived from each of these areas leading up to his period of disability.[23] Moreover, although Plaintiff apparently stopped working as an occupational medicine specialist while receiving Total Disability benefits, he continued to treat patients in pain medicine and particularly acupuncture, and maintains that the latter field is not a medical profession. Nevertheless, given the ambiguous Policy

---

[23] For example, Plaintiff did not respond to inquiries during the claim process regarding the amount of income he generated from performing acupuncture prior to November 2001, see Tr. at 136-37, and he stated in his Declaration that he "did not realize income from acupuncture prior to the onset of my disability." Declaration ¶ 4. However, as previously noted, the record shows that at the time of the alleged Work Accident, Plaintiff worked as an occupational medicine physician at Montgomery Hospital and in two offices performing pain management and acupuncture.

language, Plaintiff could reasonably have interpreted "Total Disability" to mean inability to perform what he considered to be his primary medical specialty (occupational medicine), regardless of his ability to perform part-time or even full-time work in another medical or non-medical field.   Because "current occupation" and "Total Disability" are therefore ambiguous, they must be construed in favor of Plaintiff (the insured) and against U.S. Life (the insurer).  See Webb, 348 F. Supp.2d at 328.

In contrast to these ambiguous terms, other relevant Policy terms are clear and unambiguous.  Specifically, the phrase "any gainful occupation" contained in the Policy's section addressing "Monthly Benefits Payable for Residual Disability," has an obvious and clear meaning.  In full, the provision states "If you become engaged in any gainful occupation, [U.S. Life] will pay the Monthly Benefit for Residual Disability . . . ."  See USLIFE 00011.   Although "any gainful occupation" is not defined in the Policy, the meaning of the phrase does not require definition.  Plainly construed, the phrase refers to any services for which payment is received, and means that the insured is no longer eligible for Total Disability benefits once a claimant is engaged in such services.

At oral argument, Plaintiff argued that "any gainful occupation" is ambiguous because in some policies the phrase refers to "income equal to benefits."  See Tr. at 54-55.  Plaintiff also argues that because the phrase appears in the benefit computation section for Residual Disability as opposed to the Definitions section, the phrase does not come into play if the insured believed that he or she was entitled to Total Disability benefits.  Id. at 55-58.  In furtherance of that argument, Plaintiff relies on the March 14, 2002 DRMS letter to Plaintiff  stating that he could be eligible for Residual Disability

34

benefits "[w]hen you are medically able to return to work in your current occupation but due to your medical condition are unable to sustain full-time occupational duties." USLIFE 00680; <u>Tr.</u> at 26-28.  U.S. Life argues that the March 14, 2002 letter must be read in the context of DRMS's understanding that Plaintiff's disability would be of short duration because Plaintiff was expected to recover from his injury and return to his prior work.  USLIFE 00680; <u>Tr.</u> at 31-32.[24]  Thus, U.S. Life argues that the March 14, 2002 letter does not affect the Policy language.

The language used in the letter is problematic because, rather than quoting the Policy language, it appears to conflate the term "any gainful occupation" applicable to Residual Disability with the ambiguous term "current occupation" applicable to Total Disability.  Nevertheless, I reject Plaintiff's argument that the letter alters the plain meaning of the Policy or renders it ambiguous.  The phrase "any gainful occupation" clearly and unambiguously refers to "any" gainful work and is not limited to an insured's "current occupation," notwithstanding the March 14, 2002 DRMS letter to Plaintiff.  <u>See</u> <u>Zacarias</u>, 775 A.2d at 1264 ("In the first instance, the words of an insurance policy are to be given their plain, ordinary meaning.").  It is also internally consistent insofar as had the Policy drafters intended "any gainful occupation" to refer exclusively to the insured's previous medical specialty, as Plaintiff argues, it could either have said so explicitly or used the previously-defined term "current occupation."

---

[24] Plaintiff did not identify a date he expected to return to work on his insured claim form; however, Dr. Valentino stated on his initial statement that Plaintiff was expected to recover sufficiently to perform duties in three to six months.  USLIFE 00835E, 00835F.

Plaintiff also argues that the four elements of the definition of "Residual Disability" only make sense if they refer to a claimant's current occupation.  See Doc. 315 at 7.  Specifically, Plaintiff refers to the first element, requiring that a claimant be unable to do one or more of "your substantial and material business duties" or to do "your usual daily business duties for as much time as it would normally take you to do them." These terms are not defined in the Policy, and while they do not incorporate the term "current occupation," Plaintiff is correct that in context they seem to refer to a claimant's pre-disability duties.  However, this does not alter the fact that the triggering event for application of the Residual Disability definition in the policy is becoming "engaged in any gainful occupation," and there is no necessary inconsistency in these two components of the Residual Disability provisions of the Policy.

The Policy is also unambiguous in stating that Plaintiff must provide financial records when reasonably required to do so by the insurer.  See USLIFE 00011 ("[U.S. Life] can require any proof which is considered necessary to determine your Current Monthly Income and Prior Monthly Income.  [U.S. Life] or a representative retained by [U.S. Life] will have the right to examine your financial records, as we may reasonably require.").  Plaintiff does not allege any ambiguity in this respect, and Plaintiff's counsel conceded at oral argument that Plaintiff had failed to provide requested financial documents.  Tr. at 80-81.  Plaintiff has made no argument that the request was not reasonable.

In sum, I conclude that the language of the Policy is ambiguous in part. Specifically, the terms "Total Disability" and "current occupation" are ambiguous and

therefore must be construed in favor of Plaintiff,[25] whereas the phrase "any gainful occupation" contained in the definition of Residual Disability, as well as Plaintiff's duty to provide financial documents if reasonably requested, are clear and unambiguous.[26]

### 2. Plaintiff's Claim for Breach of Contract

Plaintiff alleges that U.S. Life's decision to terminate his disability benefits constitutes a breach of contract. Specifically, Plaintiff claims that he was entitled to Total Disability benefits under the Policy, and that he continues to be entitled to such benefits because he has never returned to his former work in occupational medicine.[27] U.S. Life counters that Plaintiff's breach of contract claim fails because he never met the definition of Total Disability under the Policy.

Under Pennsylvania law, a breach of contract action requires (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. Sullivan v. Chartwell Inv. Partners, 873 A.2d 710, 716 (Pa. Super.

---

[25] This conclusion may be consistent with a ruling made in Plaintiff's New Jersey criminal fraud matter. Plaintiff attached a portion of an opinion dated December 9, 2013, made in the context of a motion to suppress evidence and to dismiss the indictment, in which Judge Wendel E. Daniels of the New Jersey Superior Court ruled that the language of the Policy "is ambiguous as to the qualifications for total disability: it is unclear whether the insured must be unable to perform his 'current occupation' or 'any gainful occupation.'" See Doc. 303-3 Exh. H at 11.

[26] It is not necessary to construe the term "Prior Monthly Income," which is used to determine eligibility for Residual Disability benefits. The parties agree that in this case Plaintiff's prior monthly income is defined in the Policy as $5,476. Tr. at 22-23.

[27] Plaintiff raised the question of his entitlement to Residual Disability in letters dated August 8, 2006, and September 15, 2006, and in later letters acknowledged he was not entitled to such benefits. See USLIFE 00090-91, 00301, 00223 (Doc. 316-2 Exh. W). Plaintiff did not assert such entitlement in this lawsuit, and continues to argue that he remains eligible for Total Disability benefits under the Policy. See tr. at 148.

2005).  Under New Jersey law, a claim for breach of contract requires (1) a contract between the parties, (2) a breach of the contract, (3) damages flowing therefrom, and (4) that the party asserting the claim performed its own contractual obligations.  Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).  There is no requirement that a breach of contract be knowing or intentional to give rise to damages.  See, e.g., Williams v. Hilton Group PLC, 93 Fed. Appx. 384, 390 (3d Cir. 2004) ("[I]f a party had a present intention to perform but later fails to perform, deliberately or otherwise, the action ordinarily is one for breach of contract."); Suburban Gas Co. v. Mollica, 32 A.2d 462, 67 (N.J. Dist. Ct. 1943) ("some breaches of the agreement might even be made unintentionally").   Because these elements are substantially similar, no conflict of law exists as between Pennsylvania and New Jersey.  See RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco, 2009 WL 2580354, at *6 (D.N.J. Aug. 19, 2009) ("It is clear that the elements required for . . . breach of contract claims are substantially similar in New Jersey and Pennsylvania.").  As noted above, the parties agree that New Jersey law applies to construction of the Policy.

As previously discussed, I have determined that the Policy is ambiguous with regard to the defined terms "current occupation" and "Total Disability," which must therefore be construed in Plaintiff's favor.  As a result of these ambiguities, Plaintiff could reasonably have interpreted "Total Disability" to mean inability to perform what he considered to be his primary medical specialty (occupational medicine), regardless of his ability to perform other part-time or even full-time work, including acupuncture.  If Plaintiff is not estopped from arguing that he was injured in November 2011, he has

raised a triable issue as to whether the alleged Work Accident resulted in his inability to perform occupational medicine. Therefore, to the extent U.S. Life argues that Plaintiff was not entitled to Total Disability benefits at the outset of his application in 2002, it is not entitled to summary judgment.

Nevertheless, the question whether Plaintiff reasonably understood that he was entitled to Total Disability benefits at the outset is not determinative of Plaintiff's claim for breach of contract. Plaintiff received Total Disability benefits through April 2006, and claims that U.S. Life breached the Policy by discontinuing benefits after that point. This claim implicates provisions beyond the ambiguous definition of "current occupation." Specifically, the Residual Disability provisions of the Policy come into play if a claimant "become[s] engaged in any gainful occupation." Although the exact nature of Plaintiff's work while receiving Total Disability benefits may be unclear, it is not disputed that he received earnings from his private practice, therefore triggering the Residual Disability provisions. Nor can it be disputed that Plaintiff failed to disclose that he was employed in gainful occupation on his supplemental proof of loss forms in June 2003, November 2004 and October 2005. On each of these forms he answered "no" to the question "Are you now gainfully employed in other than your regular occupation?" USLIFE 00583, 00514, 00479.[28] Plaintiff admits the inaccuracy of these responses, but argues that they are immaterial. Tr. at 72. In essence, Plaintiff argues that the Residual

---

[28] Plaintiff did not respond to this question on the November 13, 2002 proof of loss form. USLIFE 00660.

Disability provisions never came into play because he never returned to his current occupation of occupational medicine.  Id. at 72-73.

Plaintiff's construction is not reasonable.  Plaintiff relies on the definition of Residual Disability: "You are not able to do one or more of your substantial and material daily business duties for as much time as it would normally take you to do them, after you go back to work following a period of consecutive days of Total Disability . . . ." USLIFE 00010.  According to Plaintiff, because he never returned to occupational medicine, this definition simply did not apply to him.  However, even granting that this language is ambiguous, it does not negate the clear language of the operational Residual Disability provisions.  Residual Disability is not defined by reference to "current occupation," suggesting that Residual Disability concerns different occupational abilities. Certainly "substantial and material daily business duties" and "usual daily business duties" are not precise phrases.  Nevertheless, there is no question that they are broader than the specific "current occupation" definition.  Read as a whole as the Policy must be, including the triggering of Residual Disability by "any gainful occupation," the only reasonable construction of the Policy is that Plaintiff was no longer eligible for Total Disability once he began earning income from work.  This is further confirmed by the unambiguous obligation to provide U.S. Life access to financial records to determine Residual Disability benefits.  As noted, it is also not disputed that Plaintiff failed to provide such records when requested in 2006 and that the request was reasonable.

Accordingly, Plaintiff's receipt of earned income is not, as he suggests, immaterial to his eligibility for Total Disability benefits.  Plaintiff testified that after November

40

2001, his work at his private practice involved 34 to 36 patient contact hours, plus additional time for paperwork.  See Hayes Dep. 12/18/06 at 19.  His tax records show compensation from his private practice of $37,600 in 2002.  This evidence is undisputed and leaves no room for a triable issue as to whether Plaintiff was engaged in gainful occupation.   Under the Policy, there is thus no question that Plaintiff was not entitled to Total Disability benefits.  Therefore, even if collateral estoppel does not bar Plaintiff's claim, U.S. Life is entitled to summary judgment on Plaintiff's claim that U.S. Life breached the Policy by terminating Total Disability payments.

### 3.  Plaintiff's Claim for Violation of 42 Pa.C.S.A. § 8371 (Bad Faith)

To sustain a cause of action under section 8371, entitled "Actions on Insurance Policies," Plaintiff must demonstrate by clear and convincing evidence that (1) the insurer lacked a reasonable basis for denying benefits and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis.  See 42 Pa. C.S.A. § 8371; Klinger v. State Farm Mut. Auto. Ins. Co., 111 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)).

As stated in the previous section, U.S. Life paid Plaintiff Total Disability benefits for 50 months until it learned in early 2006 that Plaintiff had been working over the entire period, and a subsequent investigation of Plaintiff and his work-related activities and earned income, as well as his failure to provide relevant financial information, led to U.S. Life's decision to terminate his benefits.  Plaintiff has not presented evidence sufficient to support a finding that U.S. Life lacked a reasonable basis for denying total or Residual

Disability benefits under the Policy, or that U.S. Life disregarded a lack of a reasonable basis for doing so.  Therefore, even if collateral estoppel is found to be inapplicable, I conclude that U.S. Life is entitled to summary judgment on Plaintiff's claim for violation of 42 Pa. C.S.A. § 8371.

### 4.  Plaintiff's Claim for Breach of Fiduciary Duty

Plaintiff alleges that U.S. Life's decision to terminate his disability benefits constitutes a breach of fiduciary duty, while U.S. Life counters that it owed no fiduciary duty to Plaintiff or in the alterative that it performed all of its duties under the Policy. Under Pennsylvania law, an insurer does not have a fiduciary duty to an insured, except in limited circumstances such as where the insurer asserts a right to defend claims against the insured.  See Conn. Indem. v. Markham, No. 93-0799, 1993 WL 304056, at *5-6 (E.D. Pa. Aug. 6, 1993) (Yohn, J.).  This has traditionally been true in New Jersey as well.  See In re Tri-State Armored Serv., Inc., 332 B.R. 690, 735 (D.N.J. 2005) ("[A]n insurer's task of determining whether the insurance policy provided coverage . . . cannot be deemed to give rise to [a fiduciary] duty on the part of the insurer.").  However, the New Jersey Supreme Court has recognized a fiduciary duty on the part of an insurer to an insured, as Judge McLaughlin pointed out in her memorandum denying U.S. Life's motion to dismiss Count IV of the Complaint.  See Doc. 25 at 17 n.5 (citing Pickett v. Lloyd's, 621 A.2d 445 (N.J. 1993)).  Therefore, for purposes of summary judgment, I conclude that this is a valid claim under New Jersey law.  See Pickett, 621 A.2d at 467 ("We are satisfied that there is a sufficient basis in law to find that an insurance company owes a duty of good faith to its insured in processing a first-party claim.")

Because breach of fiduciary duty has been recognized in New Jersey and not in Pennsylvania, a choice of law analysis is necessary.  As previously noted, if the laws of two jurisdictions differ, the court must examine the interests and policies underlying the law of each jurisdiction to determine whether the conflict is "true," "false" or "unprovided for."  Hammersmith, 480 F.3d at 230-32.  "A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law."  Panthera Rail Car LLC v. Kasgro Rail Corp., 985 F. Supp. 2d 677, 696 (W.D. Pa. 2013) (citing Budget Rent-A-Car v. Chappell, 407 F.3d 166, 170 (3d Cir. 2005)).  "When there is a false conflict, the Court must apply the law of the only interested jurisdiction."  Id. (citing Chappell, 407 F.3d at 170).  As noted above, Pennsylvania insurance contracts do not generally give rise to a fiduciary relationship except in limited circumstances not applicable here.  See Conn. Indem., 1993 WL 304056, at *5-6 (applicable where the insurer asserts a right to defend claims against the insured); Smith v. Berg, 2000 WL 365949, at *5 (E.D. Pa. Apr. 10, 2000) (dismissing breach of fiduciary claim against insurance company defendants because "[t]he complaint does not allege any exceptional circumstances that would create a fiduciary duty in this case").  Instead, claims against insurance companies sound in breach of contract.  See Garvey v. Nat'l Grange Mut. Ins. Co., Civ. No. 95-0019, 1995 WL 115416, at *4 (E.D. Pa. Mar. 16, 1995) (Hutton, J.) ("Despite creative attempts by the Plaintiff to turn the insurance contract into a fiduciary relationship, Plaintiff's complaint here alleges nothing more than a breach of contract based on good faith and fair dealing.").  In contrast, the New Jersey Supreme Court in Pickett first noted "that there is a sufficient basis in law to

43

find that an insurance company owes a duty of good faith to its insured in processing a

first party claim" and that insurance agents are obligated to exercise good faith in

advising their insureds.   Pickett, 621 A.2d at 467.  In holding that an insurer owes a duty

to its insured to process claims in good faith, the New Jersey Supreme Court then stated:

"Implicit in that holding that the agent of the insurer owes a fiduciary duty to the insured

is that the principal owes a similar duty."  Id.  Because there is no suggestion that New

Jersey law in this regard frustrates a governmental interest of Pennsylvania, the conflict is

false and the law of the only interested jurisdiction – New Jersey – will apply.  See

Chappell, 407 F.3d at 170.  This conclusion is consistent with the parties' understanding

that New Jersey has the greater interest in the Policy.[29]

      To state a claim for breach of fiduciary duty under New Jersey law, a party must

show (1) a fiduciary duty existed between the plaintiff and the defendant, (2) the

defendant breached that duty, and (3) damages as a result of the breach.  See Rappoport

v. Robert S. Weingast & Assocs., Inc., 859 F. Supp.2d 706, 717 (D.N.J. 2012).  The duty

at issue must arise from the fiduciary relationship, meaning that Plaintiff must show that

U.S. Life owed him a duty of care with respect to the damages alleged.  See id.

      Although breach of contract and breach of fiduciary duty claims are not mutually

exclusive, in this case the analysis follows the same set of operative facts.  That is, U.S.

Life decided to terminate benefits only after it obtained evidence of Plaintiff's work

activity, investigated his work activity and income, requested and was refused certain

---

[29] U.S. Life concedes that in the event a fiduciary relationship is found to exist in
this case, New Jersey law should apply.  See Doc. 299-1 at 64.

financial documents, and sought clarification from Plaintiff regarding these issues. Under the circumstances, therefore, U.S. Life's subsequent termination of benefits cannot be said to have risen to the level of a breach of fiduciary duty.

Plaintiff argues that he placed U.S. Life on notice of his part-time acupuncture work during the entire time he received Total Disability benefits, and that U.S. Life's subsequent claim not to have known about this activity constitutes bad faith. See Doc. 303 at 16, 19-20. Plaintiff avers that he first placed U.S. Life on notice of part-time acupuncture work in Physician Questionnaire dated February 26, 2002, in which he indicated that he performed part-time acupuncture work on Wednesdays from 8:00 a.m. until 1:00 p.m. See USLIFE 00718-19, Doc. 303-2 Exh. C ¶ 10.[30] He also points to references to his work that appeared in his medical records that were provided to U.S. Life, some of which U.S. Life does not dispute. For example, U.S. Life does not dispute

---

[30] In support of his contention that he placed U.S. Life on notice of his part-time acupuncture work, Plaintiff relies on his Declaration and on medical documents which reference acupuncture work, his attempt to perform "some vocational activities," and that he was having difficulty working. See Doc. 303 at 5-6 (citing Declaration ¶¶ 10, 27-30; Exhs. D, J & K). U.S. Life has moved to strike those paragraphs of the Declaration, see Doc. 313, and argues that the medical documents are inadmissible because they were never provided in discovery or because they constitute un-authenticated hearsay. See Doc. 307 at 13. It does not appear that the Physician Questionnaire is among the contested documents. See Tr. at 63-65. In addition, the Physician Questionnaire is Bates-stamped USLIFE 00718-19, whereas the documents allegedly not in the Claim File do not have USLIFE Bates stamp numbers. See id.; Doc. 320 at 10 ("The claim file was produced years ago and bates-labeled USLIFE 00001-USLIFE 017014 without objection."). In contrast, according to U.S. Life, several of the physician records which also mention Plaintiff's part-time work were apparently never submitted to the Claim File. See Tr. at 63-65. None of the representations or documents relied upon by Plaintiff are determinative of the present issue, and therefore I do not find it necessary to resolve the question of whether these medical documents are admissible.

that the claim file contained a January 23, 2002 letter from Denis P. Rogers, M.D., which notes that Plaintiff "is an acupuncturist," or a January 15, 2002 letter from Dr. Valentino noting that Plaintiff "will continue his part time limited practice in pain management." See Tr. at 64, 65; Doc. 33-2 at 29, 49.

Accepting, for purposes of summary judgment, that U.S. Life was on notice that Plaintiff was engaged in part time private practice, Plaintiff has not pointed to any evidence from which a jury could conclude that U.S. Life breached its duty to process Plaintiff's claim in good faith.  It is not disputed that in his "Supplemental Proof of Loss Long Term Disability- Claimant Statement" forms dated May 13, 2002, June 14, 2003, November 29, 2004, and October 30, 2005, responding to the question "Are you gainfully employed in other than your regular occupation?", Plaintiff either left the line blank (on the first form) or answered "No."  USLIFE 000659, 00583, 00514, 00479 ¶ 6(d).  He was also asked to describe his present daily activities, and his response indicated sedentary type activities.  Id. ¶ 5(b).  Moreover, Dr. Valentino submitted APS's dated May 22, 2002, June 17, 2003, October 13, 2004, and November 11, 2005, in which he opined that Plaintiff continued to have a "Class 5"-level impairment, meaning severely limited and "incapable of minimal (sedentary) activity (75-100%)."  See USLIFE 00656-57, 00590-91, 00932-33, 00482-83 ¶ 7.  Given these repeated and consistent reports of Plaintiff's lack of income and inability to perform anything but sedentary activities, it cannot be said that U.S. Life exercised bad faith in discontinuing benefits when confronted by evidence that Plaintiff was earning more from his private practice than he was earning before he allegedly became disabled.

46

Therefore, even if collateral estoppel is found to be inapplicable, I conclude that U.S. Life is entitled to summary judgment on Plaintiff's breach of fiduciary duty claim.

### D.  Defendant U.S. Life's Claims Against Plaintiff

In its summary judgment motion, U.S. Life also argues that it is entitled to judgment as a matter of law on each of its counterclaims against Plaintiff.  See Doc. 299-1 at 47-76; Doc. 307 at 4-15.  Plaintiff counters that U.S. Life is not entitled to summary judgment as to its counterclaims.  See Doc. 303 at 16-24.

### 1. Counterclaim for Breach of Contract[31]

The primary basis for U.S. Life's counterclaim for breach of contract is its contention that Plaintiff failed to disclose that he was working and made material misrepresentations to U.S. Life and DRMS during the time he received Total Disability under the Policy.  See Doc. 299-1 at 56-59.  Plaintiff counters that he never hid the fact that he was working as an acupuncturist on a part-time basis, and that in any event he did not breach the contract because he was at all times entitled to Total Disability benefits based on his reasonable reading of the Policy.  See Doc. 303 at 5-6, 19-24.

I previously found that the Policy is ambiguous as to "current occupation" and "Total Disability," and that those aspects of the Policy must therefore be construed in favor of Plaintiff (the insured) and against U.S. Life (the insurer).[32]  That is, Plaintiff

---

[31] U.S. Life does not rely on collateral estoppel with respect to its counterclaims against Plaintiff; rather it only asserts collateral estoppel defensively.  See Doc. 299-1 at 43, 47; Doc. 307 at 4.

[32] As previously explained, there is no conflict of law on breach of contract.

could reasonably have interpreted "Total Disability" to mean inability to perform what he considered to be his primary medical specialty (occupational medicine), regardless of his ability to perform part-time or even full-time work in any other field of medicine or otherwise, including acupuncture.  The effect of this construction is that Plaintiff has raised a triable issue as to whether he qualified for Total Disability benefits based on his initial application.

There is no doubt that Plaintiff received at least some benefits to which he was not entitled, but in what amount?  U.S. Life's request for summary judgment is complicated by the fact that it seeks recovery of benefits that were paid to Plaintiff on a monthly basis.  To grant U.S. Life's motion would require that the exact date of Plaintiff's loss of eligibility for benefits be determined.  The record does not allow that degree of specificity.

As discussed, Plaintiff's entitlement to Total Disability benefits ended when he became engaged in gainful employment, thereby triggering the Residual Disability provisions.  This raises two fact questions that must be answered before an amount can be determined to which U.S. Life is entitled.  First, when did Plaintiff first become engaged in gainful employment?  It is not disputed that Plaintiff remained involved in his private practice and increased his hours after November 2001, but the record does not contain any specificity as to dates or months he worked.  His tax records and deposition show that he was paid $37,600 by his professional corporation for his private practice work for the year 2002, and these earnings clearly qualify as gainful employment.  However, without any monthly breakdown, the most that can be said is that he was no longer

eligible for Total Disability as of the end of the 2002.  See Doc. 316-9 Exh. CC; Hayes

Dep. 04/19/13, Doc. 299-4 Exh. B at 945.[33]

Second, was Plaintiff entitled to Residual Disability benefits after he became

engaged in gainful employment?  Although Plaintiff does not seek Residual Disability

benefits in this lawsuit, the question may nonetheless arise in calculating U.S. Life's

damages whether any amounts for Residual Disability to which Plaintiff would have been

entitled should reduce an award.  Furthermore, the analysis of Residual Disability

benefits has not been the focus of the parties' arguments on the current motions, and

factual issues remain that would preclude reaching a conclusion on the current record.

Specifically, under the Policy, once the Residual Disability provisions are triggered, the

definition of Residual Disability comes into play.  One of the elements of Residual

Disability is that the claimant has a loss of Monthly Income of at least 20 percent.  See

USLIFE 00010.  Loss of Monthly Income is defined as the difference between Prior

Monthly Income and Current Monthly Income.  See id.  The parties have stipulated that

Plaintiff's Prior Monthly Income was $5,476.  Tr. at 22-23.  Current Monthly Income is

defined as "your Monthly Income for each month of Residual Disability being claimed."

USLIFE 00010.  Although the record contains Plaintiff's earnings from his private

---

[33] Plaintiff agrees that, as of 2003, he earned more from his private practice than he earned in his occupational medicine practice.  Tr. at 131.  The parties did not provide a breakdown of his earnings from occupational medicine versus his private practice prior to November 2001.  Id.  In a post-hearing submission U.S. Life provided a table of Plaintiff's compensation from 1998 to 2006 based on the federal tax return of his professional corporation.  See Doc. 316 at 14-15.  Although this is a more complete breakdown than was submitted before the argument, it still does not fully answer the question of what was Plaintiff earning from his medical specialty versus his other practice on a monthly basis.

practice work based on his tax returns, it does not contain a monthly breakdown of that income, so it cannot be determined what his income was for each month of the period at issue. Also, if a claimant is entitled to Residual Disability benefits, the calculation of that benefit is based on a many-factored formula in the Policy that is applied to determine the proper amount "each month." USLIFE 00008. Further proceedings or clarification of the current record are necessary to determine whether Plaintiff would have been entitled to any amounts under these calculations. This precludes summary judgment in U.S. Life's favor on its counterclaim for breach of contract. [34]

### 2.    Counterclaim for Breach of Good Faith and Fair Dealing

U.S. Life argues that Plaintiff breached his duty of good faith and fair dealing, while Plaintiff responds that U.S. Life is not entitled to summary judgment on the claim. See Doc. 299-1 at 65-67; Doc. 303 at 21. Pennsylvania law does not recognize a claim for breach of good faith and fair dealing that is subsumed by a separately pled breach of contract claim, as here. See Condio v. Erie Ins. Exch., 899 A.2d 1136, 1144 (Pa. Super. 2006). Under New Jersey law, however, breach of the covenant of good faith and fair dealing is a stand-alone claim with the following elements: (1) the existence of a contract, (2) violation of contract term, (3) done arbitrarily, unreasonably, or capriciously with the objective of preventing the other party from receiving its reasonably expected fruits of

---

[34] At oral argument, U.S. Life argued that the Residual Disability calculation should be based on annual income averaged over the course of a year, and not month-by-month as argued by Plaintiff. See tr. at 74-79. U.S. Life's argument is not supported by the Policy definition of "current monthly income." USLIFE 00010 ("your Monthly Income for each month of Residual Disability being claimed"). However, I need not make a determination of the meaning of this definition at this juncture; such construction is better left to a more thorough presentation by the parties on this issue.

the contract, and (4) damages.  Wilson v. Amerada Hess Corp., 773 A.2d 1121 (N.J. 2001).  As with the breach of fiduciary duty claim discussed supra in Part C4, in the absence of a suggestion that application of New Jersey's law in this regard would impair a governmental interest in Pennsylvania, I will apply the law of the only interested jurisdiction – New Jersey.  See Chappell, 407 F.3d at 170.

U.S. Life correctly argues that the first element is met because the Policy is a contract which creates a duty of good faith and fair dealing on the part of every party to the contract.  See Doc. 299-1 at 66.  U.S. Life then argues that "the misrepresentations and false statements made by Plaintiff throughout the course of the claim," including his breach by "failing to provide truthful information for the processing of claims and refusing to provide proof of financial information as required by the Policy," satisfies the second and third elements – namely, that Plaintiff breached the contract and did so with an improper motive.  Id. at 66-67.  U.S. Life may be correct that a fact-finder will find Plaintiff's actions arbitrary, unreasonable or improper.  However, Plaintiff disputes that he knowingly made false representations or had any improper motive, and such issues are particularly within the province of a fact-finder and not for a court as a matter of law. Additionally, many of the misrepresentations upon which U.S. Life relies were made after U.S. Life began its investigation in 2006, and a fact-finder may have to determine at what point in time Plaintiff's actions became unreasonable or knowingly false. Therefore, summary judgment should be denied on this counterclaim.

### 3. Counterclaim for Conversion

U.S. Life next argues that because Plaintiff was not entitled to Total Disability or Residual Disability under the Policy, U.S. Life is entitled to summary judgment on its counterclaim for conversion.  See Doc. 299-1 at 67-69.  Under Pennsylvania law, conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without justification."  Lawn v. Enhanced Serv. Billing, Inc., No. 10-1196, 2010 WL 2773377, at *3 (E.D. Pa. July 13, 2010) (Joyner, J.) (citing Stevenson v. Econ. Bank of Anbridge, 197 A.2d 721, 726 (Pa. 1964)).  Under New Jersey law, "[t]he crux of conversion is wrongful exercise or control over property of another without authorization and to the exclusion of the owner's rights in that property."  Chicago Title Ins. Co. v. Ellis, 978 A.2d 281, 288 (N.J. Super. App. Div. 2009).  In both states, money is considered chattel and may be the subject of conversion.  Lawn, 2010 WL 2773377, at *3 (citing Shonberger v. Oswell, 530 A.2d 112, 114 (Pa. Super. 1987)); Ellis, 978 A.2d at 288.  Because these elements are substantially similar, no conflict of law exists as between Pennsylvania and New Jersey.

Here, U.S. Life argues that because Plaintiff was never entitled to receive any disability payments under the Policy and that he did so only through intentional deception, U.S. Life is entitled to judgment as a matter of law on its counterclaim for Plaintiff's conversion of benefit payments "in the amount of no less than $183,800."  Doc. 299-1 at 69.  Summary judgment is inappropriate in view of the fact issues that remain as to what if any benefits Plaintiff was entitled to, as discussed with respect to

U.S. Life's motion in its counterclaim for breach of contract.  Additionally, while the record contains evidence of inaccuracies and inconsistencies on Plaintiff's part, it is not sufficient to make a finding of intentional deception and this issue is better left for a jury.

### 4.   Counterclaim for Unjust Enrichment

U.S. Life next argues that because Plaintiff was not entitled to any benefits under the Policy, U.S. Life is entitled to summary judgment on its counterclaim for unjust enrichment.  See Doc. 299-1 at 70-71.  Under Pennsylvania law, unjust enrichment requires "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa Super. 2001) (quoting Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. 1993)).  Under New Jersey law, plaintiff must show that defendant received a benefit and that retention of that benefit under the circumstances would be unjust.  Snyder v. Farnam Cos., 792 F. Supp.2d 712, 723-24 (D.N.J. 2011) (citations omitted).   Because these elements are substantially similar, no conflict of law exists as between Pennsylvania and New Jersey.

The analysis here is identical to the previous section, and for the same reasons stated above, I conclude that U.S. Life's motion as to its counterclaim for unjust enrichment should be denied.

### 5.   Counterclaim for Fraud

U.S. Life next argues that it is entitled to summary judgment on its counterclaim for fraud.  See Doc. 299-1 at 71-73.  Under Pennsylvania law, common law fraud

requires "(1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result." <u>Rizzo v. Michener</u>, 584 A.2d 973, 980 (Pa. Super. 1990) (citation omitted).  Under New Jersey law, common law fraud requires proof of "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other party rely upon it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." <u>Bell Atl. Network Servs. v. P.M. Video Corp.</u>, 730 A.2d 406, 417 (N.J. Super. App. Div. 1999) (quoting <u>Gennari v. Weichert Co. Realtors</u>, 691 A.2d 350 (N.J. 1997)). Because the proofs require similar elements, no conflict of law exists as between Pennsylvania and New Jersey as to fraud.

Again, for the reasons previously stated, a finding of fraud is not appropriate on this record and should be left for a jury.

### 6.  Counterclaim Pursuant to New Jersey Fraud Prevention Act

Finally, U.S. Life seeks summary judgment on its counterclaim brought pursuant to the New Jersey Fraud Prevention Act, N.J.S.A. § 17:33A-1, <u>et seq.</u>  <u>See</u> Doc. 299-1 at 73-76.  The statute is intended "to confront aggressively the problem of insurance fraud in New Jersey by," among other things, "facilitating the detection of insurance fraud . . . ."  N.J.S.A. § 17:33A2.  A person violates the statute if he:

> (1)  Presents or causes to be presented any written or oral
> statement as part of, or in support of or opposition to, a claim
> for payment or other benefit pursuant to an insurance policy

54

> . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company . . . in connection with, or in support of or opposition to any claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

N.J.S.A. § 17:33A4 (1)-(3).  The statute also permits actions to be brought by insurance companies against violators "to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys fees," and provides for "treble damages if the court determines that the defendant has engaged in a pattern of violating the act."  Id. §17:33A-7.

For the same reasons discussed previously, I find that U.S. Life is not entitled to summary judgment as to this claim.

## V.   DEFENDANT AIG'S MOTION FOR SUMMARY JUDGMENT

As an initial matter, I note that because Plaintiff's claims against AIG are essentially identical to those against U.S. Life, and because AIG has joined U.S. Life's motion for summary judgment, I recommend that AIG be granted summary judgment on each of Plaintiff's claims for the reasons discussed in the previous sections. Nevertheless, I will separately address AIG's motion in the interest of thoroughness.

55

In its separate motion for summary judgment, Defendant AIG argues that it is entitled to judgment as a matter of law on all of Plaintiff's claims because AIG is not in privity of contract with Plaintiff.  <u>See</u> Doc. 296-1 at 1-11; Doc. 306 at 1-5.  Plaintiff counters that the existence of a letter and an e-mail with AIG letterhead creates a genuine issue of material fact as to whether AIG directed the denial and termination of Plaintiff's disability benefits and/or the filing of criminal charges against him.  <u>See</u> Doc. 303 at 24-25.

In support of its motion, AIG submits an affidavit from Patrick M. Burke, Assistant Secretary for AIG.  <u>See</u> Doc. 296-2.  In the affidavit, Mr. Burke states that AIG is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in New York, that AIG is a publicly listed holding company, and that U.S. Life is a wholly-owned subsidiary of AIG.  <u>Id.</u> ¶¶ 3-6.  Mr. Burke states that "AIG is not an insurance company and does not write or issue insurance policies [and] does not administer claims under insurance policies issued by any of its subsidiaries, including U.S. Life."  <u>Id.</u> ¶ 7.  Because AIG is merely a holding company and does not administer claims made under any insurance policy, Mr. Burke states that "AIG could not have been involved, and was not involved, in the administration or handling of any claim that is the subject of the pending litigation."  <u>Id.</u> ¶ 9.  Finally, Mr. Burke states that "[e]ach of AIG's subsidiaries is an entity separate and distinct from AIG" and that "AIG's subsidiary companies each maintain their own corporate formalities, including separate books, financial accounts, statutory reserves, as well as separate Board of Directors, members, [and] managers and/or partners, as applicable."

56

Id. ¶ 10.  AIG argues that because Plaintiff solely contracted with U.S. Life to provide

disability income benefits, because the Policy was solely issued by U.S. Life and not by

AIG, and because AIG is not a signatory to the Policy, AIG is not a party to the contract

and therefore cannot be liable for breach of the contract or any other theory of liability.[35]

Plaintiff does not explicitly contest the veracity of Mr. Burke's affidavit.  Instead,

Plaintiff argues that a genuine issue of material fact exists as to whether AIG authorized

and directed the actions undertaken by U.S. Life and DRMS in terminating Plaintiff's

disability benefits and in filing a criminal complaint against him, and in support thereof

Plaintiff cites two documents and an e-mail containing "AIG American General"

letterheads.  See Doc. 303 at 24-25.  The first document is a letter dated November 9,

2006, apprising Plaintiff that the May 18, 2006 decision to terminate his benefits would

stand, the second document is a "Suspicious Claim/Application Notification Form"

whereby criminal proceedings were first instituted against Plaintiff, and the e-mail is

"internal correspondence from DRMS."  See id. at 24 (citing Plaintiff's Declaration at

Doc. 303 ¶ 6); USLIFE 00291, Doc. 303-2 Exh. B.

Plaintiff's reliance on these documents is problematic for several reasons.  First,

they refer to "AIG American General" and not to "American International Group, Inc.,"

and Plaintiff submits no evidence to contest the proper corporate name of Defendant

---

[35] As previously noted, no conflict of law analysis is necessary for breach of contract because "[i]t is clear that the elements required for . . . breach of contract claims are substantially similar in New Jersey and Pennsylvania."  RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco, 2009 WL 2580354, at *6 (D.N.J. Aug. 19, 2009).  Although Plaintiff asserts several claims against AIG, the existence of a contractual relationship is a necessary prerequisite.

AIG. Second, the documents constitute inadmissible hearsay insofar as they are unverified and there is no indication of who created the documents. Third, the documents do not constitute evidence of a contractual relationship between Plaintiff and AIG, and Plaintiff cites no case law in support of an argument for piercing AIG's corporate structure. To the contrary, an insurance company is not deemed to be a party to a contract simply because affiliated companies utilized its letterhead. See Lockhart v. Fed. Ins. Co., No. 96-5330, 1998 WL 151019, at *3 (E.D. Pa. Mar. 30, 1998) (Waldman, J.) (use by affiliated companies of stationery with a common corporate letterhead belonging to defendant "does not make that defendant a party to plaintiff's insurance contract"). For these reasons, Plaintiff has failed to raise a genuine issue of material fact as to whether AIG is in privity of contract with Plaintiff, and AIG is entitled to summary judgment on Plaintiff's claim for breach of contract.

Plaintiff has also alleged that AIG violated 42 Pa. Cons. Stat. Ann. § 8371, which provides a cause of action on insurance policies "if the court finds that the insurer has acted in bad faith toward the insured." 42 Pa. Cons. Stat. Ann. § 8371. However, "it is a general rule that an insured may bring claims for breach of contract and bad faith against the insurer who issued the policy but not against related parties . . . who are not in privity with the insured." Brand v. AXA Equitable Life Ins. Co., No. 08-2859, 2008 WL 4279863, at *2 (E.D. Pa. Sept. 16, 2008 (Bartle, C.J.); see also Lockhart, 1998 WL 151019 at * 4 ("A defendant who is not legally obligated to pay a claim cannot be liable for knowingly or recklessly denying a claim under a policy without a reasonable basis.")

58

(citing Klinger v. State Farm Mut. Auto Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994)).

Therefore, AIG is entitled to summary judgment on Plaintiff's statutory bad faith claim.

Similarly, Plaintiff's claim for breach of fiduciary duty must also fail.  As

previously noted, an insurer does not have a fiduciary duty to an insured under

Pennsylvania law except in limited circumstances such as where the insurer asserts a

right to defend claims against the insured.  See Brown v. Progressive Ins. Co., 860 A.2d

493, 500 (Pa. Super. 2004); Conn. Indem., 1993 WL 304056, at *5-6.  However, for

purposes of summary judgment, I have concluded that breach of fiduciary duty is a valid

claim under New Jersey law in the context of a first-party claim.  See Pickett, 621 A.2d at

467.  In any event, because AIG is not a party to the contract and is not even mentioned

in the Policy, AIG is entitled to summary judgment on this claim as well.

In sum, AIG joined U.S. life's summary judgment motion and is entitled to

summary judgment for the same reasons discussed in the previous sections.  Additionally,

I conclude that AIG is entitled to summary judgment for the reasons discussed in this

section, namely lack of privity of contract.  Therefore, AIG's motion should be granted.

## VI.   DEFENDANT U.S. LIFE'S MOTION TO PRECLUDE EXPERT

As previously explained, Plaintiff retained Jim Howarth for the purpose of

rendering an expert opinion on 3,556 CPT Codes submitted by Plaintiff for payment to

various insurance companies through his former billing service, GMB.  Mr. Howarth

thereafter drafted an expert report in the form of an affidavit in which he opined that the

CPT Codes submitted by Plaintiff during the period he received Total Disability benefits

pertained only to acupuncture and not to occupational medicine.  See Howarth Report

¶ 6.  In its motion, U.S. Life seeks to preclude Mr. Howarth's testimony because he does not qualify as an expert under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and in the alternative because his expert report is not premised on good grounds, is illusory, and lacks a proper foundation.  <u>See</u> Docs. 301 & 308.  Plaintiff counters that Mr. Howarth is well-qualified to offer an opinion as to the meaning of billing codes submitted for billing on Plaintiff's behalf.  <u>See</u> Doc. 304 at 3-6.

A.   <u>**Legal Standard**</u>

The admissibility of expert testimony is primarily governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, Rule 702 sets forth three principle requirements – "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or other specialized knowledge; and (3) the expert testimony must assist the trier of fact."  <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 244 (3d Cir. 2008) (citing <u>In Re: Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741-42 (3d Cir. 1994)).  Rule 702 has "a liberal policy of admissibility."  <u>Pineda</u>, 520 F.3d at 243 (quoting <u>Kannankeril v. Terminix Inter., Inc.</u>, 128 F.3d 802, 806 (3d Cir. 1997)).

In <u>Daubert</u>, the Supreme Court explained that, under the Federal Rules of Evidence, the trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." 509 U.S. 579, 589 (1993); <u>see</u> <u>also</u> <u>Pineda</u>, 520 F.3d at 244. "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." <u>Pineda</u>, 520 F.3d at 244 (quoting <u>Paoli</u>, 35 F.3d at 742). Thus, the focus of the inquiry is on the methodology used by the expert, rather than the conclusions reached. <u>See</u> <u>id.</u>

To establish reliability, the expert must have "good grounds" for his or her belief. <u>Schneider ex rel. Estate of Schneider v. Fried</u>, 320 F.3d 396, 404 (3d Cir. 2003). There is no definitive checklist used in evaluating expert testimony, and the court's inquiry must be tied to the specific facts of a particular case. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150-51 (1999). The Third Circuit has suggested the following list of factors that the trial judge may consider in determining reliability:

> (1)     Whether a method consists of a testable hypothesis;
> (2)     Whether a method has been the subject of peer review;
> (3)     The known or potential rate of error;
> (4)     The existence and maintenance of standards controlling the techniques and operations;
> (5)     Whether the method is generally accepted;
> (6)     The relationship of the technique to methods which have been established as reliable;
> (7)     The qualifications of the expert testifying based on the methodology; and
> (8)     The non-traditional uses to which the method has been put.

<u>Pineda</u>, 520 F.3d at 248 (citing <u>Paoli</u>, 35 F.3d at 742 n.8).

B.    <u>Discussion</u>

    **1. Whether Mr. Howarth is Qualified as an Expert**

In his two-page, seven-paragraph report, Mr. Howarth describes himself as

"President of [GMB]," a medical billing company which manages and processes medical

billing for physicians, and as "an expert in the assignment and analysis of CPT Codes,"

and he states that he holds his opinions "to a reasonable degree of medical certainty."

<u>See</u> Howarth Report ¶¶ 1-2, 6.[36]  However, Plaintiff did not provide Mr. Howarth's

curriculum vitae evidencing his qualifications to render a medical or any other opinion,

thus preventing other parties from investigating Mr. Howarth's credentials and violating

the required disclosures for expert testimony.  <u>See</u> Fed. R. Civ. P. 26(a)(2)(B)(iv) ("The

[expert] report must contain: . . . (iv) the witness's qualifications, including a list of all

publications authored in the previous 10 years.").  Plaintiff argues that Mr. Howarth's

self-reported expertise in reading CPT Codes "is tantamount to a representation that he is

able to read the CPT Codes promulgated by the AMA and to identify the services for

which they stand."  Doc. 304 at 5 (emphasis omitted).  However, Mr. Howarth's report

does not contain a description of his work experience with medical billing codes or a

summary of his employment history or job responsibilities with GMB or any other

company, nor does it contain any information evidencing specialized knowledge via work

---

[36] Mr. Howarth states that CPT Codes are "the necessary descriptive tags which must be provided by a physician to an insurance company or other payor in order for the physician to be paid."  Howarth Report ¶ 2.  According to the AMA, "CPT" is its registered trademark that stands for Current Procedural Terminology.  <u>See</u> http://www.ama.org/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/about-cpt.page? (last visited July 17, 2014).

experience, education background or formal training.  In short, the fact that Mr. Howarth represents himself as an "expert" does not automatically entitle him to be qualified as an expert.

In essence, all that Plaintiff has provided is Mr. Howarth's job title and the fact that CPT Codes are "the most widely accepted nomenclature used to report medical procedures and services under public and private health insurance programs."  See Howarth Report ¶ 1; Doc. 304 Exh. B (screenshot of AMA website).  As such, Plaintiff has failed to demonstrate that Mr. Howarth qualifies as an expert in this case, particularly with regard to rendering his opinions "to a reasonable degree of medical certainty."  See Am. Tech. Res. v. U.S., 345 F.Supp. 1290, 1291 (E.D. Pa. 1972) (expertise can be acquired through practical experience as well as formal education, but general knowledge, training and experience will not suffice); Globe Indem. Co. v. Highland Tank & Mfg. Co., 345 F.Supp. 1290, 1291 (E.D. Pa. 1972) (witness disqualified because although generally qualified in area of expertise, found not qualified in specific area asked to testify about).  Therefore, I conclude that U.S. Life's motion should be granted on this basis.

### 2.  Whether Mr. Howarth's Report Is Reliable

In the alternative, U.S. Life argues that in the event Mr. Howarth is found to be qualified, his testimony should nevertheless be precluded under Rule 702 because his report fails to satisfy Daubert's requirement that the expert's testimony or evidence be "not only relevant, but also reliable."  509 U.S. at 589.  As previously explained, the factors considered when determining reliability turn largely on methodology.  See

Pineda, 520 F.3d at 248 (setting forth eight factors for reliability); Heller v. Shaw Indus.

Inc., 167 F.3d 146, 152 (3d Cir. 1999) (courts "must examine the expert's conclusions in

order to determine whether they could reliably flow from the facts known to the expert

and the methodology used").  Even were I to find that Mr. Howarth qualified as an

expert, I would recommend that the motion be granted on this alternative basis.

　　　　In his expert report, Mr. Howarth first explains that CPT Codes indicate "the

nature and extent of the medical service it presents for payment," and that "each medical

specialty tends to have its own particular indicators such as, in this case, 'Acupuncture.'"

Howarth Report ¶¶ 2, 3.  He then explains that he had been furnished by Plaintiff's

former counsel with two CDs "and asked to certify within a reasonable degree of medical

certainty, as to whether any CPT Codes covering billings thereon by [Plainitff] after

November 21, 2001 were applicable" to occupational medicine or to acupuncture.  Id. ¶

4.  Mr. Howarth's entire methodology and conclusion are then set forth in two

paragraphs:

> 5.　　In order to be able to answer the questions
> posed, I opened and printed out the billing dates and CPT
> Codes recorded on the 2 CD's . . . .　The summary print-outs
> are attached as Exhibit A, representing one disc, and Exhibit
> B, representing the other.  I note that the earliest billing date
> noted is December 10, 2002.
>
> 6.　　Aside from the CPT Codes describing generic
> services such as "office visit," which would be applicable to
> any medical specialty; I found, to a reasonable degree of
> medical certainty, no CPT Code entries on either disc
> applicable to Occupational Therapy.  All non-generic CPT
> Code entries were applicable, to a reasonable degree of
> medical certainty, to the practice of Acupuncture.

Id. ¶¶ 5-6.

I find that Mr. Howarth's expert report does not satisfy the test for reliability.  For example, Mr. Howarth first notes that each medical specialty "tends" to have its own CPT Codes, and then concludes that "all" of the "non-generic" codes he reviewed relate exclusively to acupuncture – a sweeping, conclusory opinion offered without specific examples, comparative citations, or any other helpful information which could reliably convert entries which "tend" to show something into ones which actually do so. Moreover, aside from Mr. Howarth's simple reading of the CPT Code print-outs, the report does not contain any reference to principles relied upon or methods utilized, it does not rely upon any treatise or reference material to support the conclusion reached, and it does not mention any steps taken which may have verified or bolstered his conclusion. Therefore, the court is unable to make any judgment as to such Pineda factors as whether Mr. Howarth utilized a method which is the subject of peer review, whether the "summary print-outs" have a known or potential rate of error, whether standard techniques exist for ensuring the reliability of the codes, and whether the method utilized is reliable.  See 520 F.3d at 248.

For the aforementioned reasons, I conclude that there is insufficient basis on which to find that Mr. Howarth qualifies as an expert witness, and that even if there were, there is an insufficient basis in which to conclude that his testimony would be reliable. Therefore, I recommend that U.S. Life's motion to preclude expert be granted.

## VII.   U.S. LIFE'S MOTION TO STRIKE PLAINTIFF'S DECLARATION

On the eve of oral argument on its motion for summary judgment, Defendant U.S. Life filed a motion to strike significant portions of Plaintiff's Declaration submitted with his response to U.S. Life's summary judgment motion.  See Doc. 313-1.[37]  In its motion, U.S. Life argues that numerous paragraphs of the Declaration should be stricken because they contain assertions which "are permeated with impermissible hearsay, improper conclusions of law and many conclusory and unsupported statements."  Id. at 2.  U.S. Life also argues that all paragraphs of the Declaration which rely upon the attached report of Dr. Michael Saulino should be stricken because the doctor's report is unsworn.  Id. at 4-5.  Plaintiff has filed a response opposing the motion, together with a Declaration from Dr. Saulino to which Plaintiff attached materials previously docketed at Doc. 303-1 Exh. J.  See Doc. 318 & Doc. 318-1.  U.S. Life has filed a reply brief in support of the motion. See Doc. 320.

Federal Rule of Civil Procedure 56 states in relevant part that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).[38]  The explanatory note to the 2010 amendments to Rule 56(c)(4) states that

---

[37] Plaintiff's Declaration is found at Doc. 303-1.  Plaintiff signed the Declaration, which states "I declare under penalty of perjury the foregoing is true and correct."  Id. at 15.

[38] "Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1)."  Fed. R. Civ. P. 56 (Advisory Comm. Notes).  Under the previous version,

"[t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached . . . is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record."  Fed. R. Civ. P. 56 (Advisory Comm. Notes).  "This standard precludes an affiant from opposing a summary judgment motion by offering statements of mere belief."  Thankachen, 1996 WL 84270 at *2; see also Williams v. Borough of W. Chester, 891 F.2d 458, 470 (3d Cir. 1989) (Garth, J., concurring) ("Facts made of personal knowledge are admissible.  Beliefs, no matter how sincere, are not.").  Hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.  See Stelwagon Mfg. Co. v. Tarmac Roofing, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).  However, legal conclusions contained in affidavits or declarations cannot be regarded as competent factual evidence and should be disregarded.  See IBEW, Local Union No. 5 v. Krater Servs., No. 08-063J, 2011 WL 1136797, at *16  (W.D. Pa. Mar. 25, 2011) (citing Brown v. Caterpillar Tractor Co., 696 F.2d 246, 256 n.21 (3d Cir. 1982)).

U.S. Life asserts multiple grounds for striking various paragraphs of the Declaration, and therefore I will address the motion based on the grounds raised rather

---

affidavits used to support or oppose a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Thankachen v. Cardone Indus., No. 95-0181, 1996 WL 84270, at *2 (E.D. Pa. Feb. 27, 1996) (McGlynn, J.).  Therefore, for present purposes, former Rule 56(e)(1) and present Rule 56(c)(4) are essentially identical.

than by discussing the propriety of each paragraph individually.  First, U.S. Life moves to strike various sub-sections of paragraph 10, arguing that they improperly impute knowledge of Plaintiff's part-time work to DRMS based upon his doctors' records that were obtained during litigation but not provided to DRMS during the claim process.  See Doc. 313-1 at 3 (citing Decl. ¶ 10, Denis Rogers, M.D., (b)-(e); Bruce Coplin, M.D. (a); Steven J. Valentino, D.O. (b) and (c)); Doc. 320 at 10-12. [39]  In essence, the parties dispute whether these medical records were ever received as part of the claim file, which U.S. Life identifies as all documents Bates stamped USLIFE 00001-01704.  See Doc. 20 at 10.  However, I have already concluded that U.S. Life is entitled to summary judgment on Plaintiff's claims even assuming that it was on notice of Plaintiff's part-time work, in light of Plaintiff's repeated representations that he was not engaged in any gainful employment.  The question whether these medical records are admissible is best addressed in a pretrial motion in limine.   See supra at 45 n.30.  Therefore, U.S Life's motion to strike on this basis is denied.

Next, U.S. Life seeks to strike multiple paragraphs because Plaintiff "sets forth conclusions and opinions of which he is not competent to testify."  See Doc. 313-1 at 3 (citing ¶¶ 1, 3, 12, 13, 15, 16, 20, 21, 23-25, 30).  Many of the cited paragraphs are not problematic.  Paragraph 1 is merely an introduction in which Plaintiff states that he is "fully familiar with the facts and circumstances set forth herein."  Decl. ¶ 1.  Paragraph 3

---

[39] As noted by Plaintiff (Doc. 318 at 8 n.2), U.S. Life has not moved to strike paragraph 9 of the Declaration in which Plaintiff explains that he completed and returned a questionnaire to DRMS in which he explicitly stated that he was working part-time as a licensed acupuncturist.  See Decl. ¶ 9 (citing Doc. 303-1 Exh. C.)

states that "I made a claim against the Policy on the basis of my inability to perform the substantial and material duties of my then-current occupation as a physician practicing occupational medicine," which is a statement of his own understanding that is at the heart of the matter before the court.  Id. ¶ 3.  In paragraphs 15 and 16, Plaintiff explains the difference between a physician practicing occupational medicine and the practice of acupuncture, which is not a medical specialty – matters within his knowledge and over which he would be expected to testify at trial.  Id. ¶¶ 15-16.   In paragraphs 20 and 21, Plaintiff sets forth his understanding of the Residual Disability provision of the Policy and statements made about Residual Disability by a DRMS analyst in a letter dated February 21, 2002.  Id. ¶¶ 20, 21.  Both Plaintiff's own understanding and how that may have been effected by the DRMS letter will be matters presented at trial, and in any event the DRMS letter constitutes an admission of a party-opponent and is therefore not objectionable on grounds of hearsay pursuant to Rule of Evidence 801(d)(2).

Paragraphs 12, 13, 23, 24, 25 and 30, however, are problematic because they contain legal conclusions and opinions over which Plaintiff is not competent to testify. See Decl. ¶ 12 ("U.S. Life's claim that the income which I earned as an acupuncturist after my disability began must be considered in the determination of whether or not I am entitled to disability benefits is completely contrary to the plain language of my Policy."); ¶ 13 ("[I]t is beyond dispute that **at the very least** the language of the Policy is ambiguous.") (emphasis in original); ¶ 24 ("In its Motion, U.S. Life argues that Residual Disability benefits are determined based upon annual income.  That is not correct.  Once again, U.S. Life is deliberately misstating the terms of its own Policy. . . ."); ¶ 25

(referencing an attached summary of post-disability gross income for 2002-2013 and stating "This means that **even if** [U.S. Life's] interpretation of the Policy is correct, . . . I qualified for Residual Disability benefits in each of those months . . . .") (emphasis in original); ¶ 30 ("Dr. Saulino's opinion is consistent with those of my treating physicians . . . ."). Similarly, paragraph 23, to the extent it refers to the New Jersey Court's conclusion that the Policy is ambiguous, should be stricken as a legal conclusion. Id. ¶ 23.[40]  Therefore, U.S. Life's motion should be granted as to paragraphs 12, 13, 23-25 and 30.

Next, U.S. Life argues that portions of the Declaration are improper because they contain "incomplete and/or inaccurate averments." See Doc. 313-1 at 4 (citing paragraphs 6, 15, 17, 18, 21-24); Doc. 320 at 6-8 (same).  I previously found that paragraph 24 should be stricken and that paragraphs 15, 21 and 23 should not be stricken because they concern matters within Plaintiff's knowledge and over which he would be expected to testify at trial.  The same is true of the remaining paragraphs.  Paragraph 6 references the May 18, 2006 letter by which DRMS advised Plaintiff that his benefits were being terminated and that criminal charges were subsequently filed in New Jersey, paragraphs 17 and 18 merely set forth definitional language from the Policy, and paragraph 22 quotes the March 14, 2002 letter sent to Plaintiff by DRMS.  These letters are part of the record and their authenticity has not been questioned.  Therefore, I find no basis to strike these paragraphs.

---

[40] The relevance of the New Jersey criminal proceedings is a matter best left to a pretrial motion in limine.

Next, U.S. Life argues that the "Declaration is also improper because it contains conclusory statements which are unsupported by facts of record and argument."  See Doc. 313-1 at 4 (citing paragraphs 3, 4, 6-8, 10-16 & 20-26); Doc. 320 at 2-3 (same).   I have already concluded that paragraphs 12, 13, 24 and 25 should be stricken, and that paragraphs 3, 6, 10, 15, 16, and 20 through 23 should not be stricken because they are undisputedly part of the record and/or concern matters within Plaintiff's understanding and over which Plaintiff would be expected to testify at trial.  As for the remainder, paragraphs 4 and 7 set forth Plaintiff's own understanding of the work he performed prior to after his disability, and why he switched from occupational medicine to acupuncture, which is at the heart of the case and over which he will testify at trial.  See Decl. ¶ 64.  Paragraph 11 refers to oral conversations Plaintiff had with U.S. Life's representatives, which are also matters over which he could testify, and paragraph 14 is merely a statement regarding the course of his Declaration.  See id. ¶¶ 11 & 14.  U.S. Life's motion should be denied as to these paragraphs.  Paragraphs 8 and 26, however, should be stricken because they contain improper conclusory statements.  See ¶ 8 ("U.S. Life was well aware of the fact that I was working part-time performing acupuncture."); ¶ 26 ("Moreover, [U.S. Life's] claim that I was "not disabled" is fundamentally flawed because it too does not differentiate from year to year or month to month.").  Therefore, U.S. Life's motion should be granted as to paragraphs 8 and 26.

Next, U.S. Life argues that several paragraphs of the Declaration should be stricken because they contain improper hearsay.  See Doc. 313-1 at 4 (citing paragraphs 6, 10, 11, 20-23 & 25-30); Doc. 320 at 8-10.  Of these, I have already found that

paragraphs 25, 26 and 30 should be stricken.  Of the remainder, I previously found that paragraphs 6, 10, 11, and 20 through 23 should not be stricken because they relate to documents with are unquestionably part of the record and/or concern matters within Plaintiff's understanding and over which Plaintiff would be expected to testify at trial. For the same reasons, these paragraphs should not be stricken on the basis of hearsay. The remaining paragraphs (27, 28 and 29) relate to the expert report of Dr. Saulino, to which U.S. Life initially objected because it was unsworn.  Plaintiff submitted an affidavit from Dr. Saulino attached to his response to the motion to strike, in which the doctor swears that the narrative "represents my professional medical opinion relative to Joseph T. Hayes, M.D., rendered within a reasonable degree of medical certainty."  See Doc. 318-1.  In light of this affidavit, U.S. Life has withdrawn its motion with respect to the unsworn nature of Dr. Saulino's report.  See Doc. 310 at 9.  Therefore, the motion as to paragraphs 27, 28 and 29 is denied as moot.

U.S. Life also seeks to strike various paragraphs of Plaintiff's Declaration because it contradicts former deposition testimony.  See Doc. 313-1 at 4 (citing paragraphs 4, 7, 12, 16, 21 through 23, and 25); Doc. 320 at 3-6 (same).  To the extent Plaintiff's sworn statements conflict with prior sworn testimony, U.S. Life is free to present those inconsistencies to a jury at trial.  Finally, to the extent U.S. Life argues that other paragraphs should be stricken because they express Plaintiff's "beliefs and understanding," see Doc. 313-1 at 4, the paragraphs cited have been previously addressed.

U.S. Life lastly argues that Plaintiff's response to U.S. Life's motion for summary judgment is improper because "Plaintiff simply attached his deficient Declaration in support of his Response brief."  Doc. 313-1 at 4-5.  For the reasons stated above, I do not find the Declaration to be entirely deficient, and in any event I note that Plaintiff attached numerous exhibits to his briefing and also cited to exhibits which were attached to U.S. Life's motion.  Therefore, this aspect of U.S. Life's motion to strike should be denied.

Plaintiff invites the Court to allow him to correct any deficiencies which are identified in his Declaration, citing Rule 56(e).  See Doc. 318 at 8.  Rule 56(e) is discretionary.  See Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact . . ., the court may: (1) give an opportunity to properly support of address the fact.").  Given the lengthy briefing process, numerous briefs and copious exhibits the parties have already submitted to the court, I do not find it necessary to further delay this matter by giving Plaintiff an opportunity to submit another Declaration, potentially setting into motion yet another dispute between the parties.  Moreover, as Plaintiff's factual averments have not been stricken, his request is moot.  Therefore, I decline to permit Plaintiff to cure the deficiencies which have been found in his Declaration.

In sum, I recommend that U.S. Life's motion to strike Plaintiff's Declaration be granted in part and denied in part.  Specifically, I recommend that the motion be granted as to paragraphs 8, 12, 13, 23, 24, 25, 26 and 30, which should be stricken; denied as moot as to paragraphs 27, 28 and 29; and denied in all other respects.

## VIII.  <u>CONCLUSION</u>

U.S. Life is entitled to summary judgment as to Plaintiff's claims by operation of collateral estoppel or, in the alternative, because there is no genuine dispute of material fact as to Plaintiff's claims for breach of contract, bad faith and breach of fiduciary duty. Genuine disputes of material fact exist as to the timing of Plaintiff's entitlement to Total Disability benefits and whether he was entitled to Residual Disability benefits after he became engaged in gainful employment, and therefore U.S. Life is not entitled to summary judgment as to its counterclaims.  AIG joined U.S. Life's summary judgment motion and is therefore entitled to summary judgment as to Plaintiff's claims for the same reasons, and because there is no privity of contract between Plaintiff and AIG.  U.S. Life's motion to preclude expert should be granted because there is insufficient basis on which to find that Mr. Howarth qualifies as an expert witness, and that even if there were, there is an insufficient basis in which to conclude that his testimony would be reliable. Lastly, U.S. Life's motion to strike Plaintiff's Declaration should be granted as to paragraphs 8, 12, 13, 23, 24, 25, 26 and 30, which should be stricken; denied as moot as to paragraphs 27, 28 and 29; and denied in all other respects.

Accordingly, I make the following:

## **R E C O M M E N D A T I O N**

AND NOW, this   29th       day of July 2014, it is RESPECTFULLY

RECOMMENDED that U.S. Life's motion for summary judgment (Doc. 299) be

GRANTED IN PART AND DENIED IN PART; AIG's motion for summary judgment

(Doc. 296) be GRANTED; U.S. Life's motion to preclude the testimony of Plaintiff's

expert witness (Doc. 301) be GRANTED; and U.S. Life's motion to strike Plaintiff's

affidavit (Doc. 313) be GRANTED IN PART AND DENIED IN PART.

BY THE COURT:

/s/ELIZABETH T. HEY

_____

ELIZABETH T. HEY, M.J.